Washburn, P. J.
This is a contest arising among members of the St. John’s Greek Catholic Congregation, plaintiffs, claiming that the property of the Congregation was acquired to be used for a particular form of worship to which it was dedicated and used for many years, being held by the Congregation in trust for such use, and that the defendants, in violation of such trust, are diverting such Church and property from the uses and purposes for which it was dedicated and used.
There are involved two well-defined and distinct forms of worship, or church organization, one the Greek Catholic Uniat Church, and the other the Russian Orthodox Church.
*371 Originally, there was the Roman Catholic Church, in which because of difference in language there was used the Western or Latin rite, and also the Eastern or Byzantine rite.
There were differences in ritual, discipline and practices between the Eastern and the Western rites, but in all essentials of dogma, they were one, under the primacy of the Pope.
The differences were magnified, and later extended to matters of dogma, and a final separation took place, and thereafter there was what is known as the Eastern or Russian Orthodox Church, under the jurisdiction of the Holy Synod, which in later years was under the complete domination of the Russian Czar, and the Western, or Roman Catholic Church, under the jurisdiction of the Holy See, acknowledging the primacy and supremacy of the Pope.
There were, and ever since the separation there have been, eastern people of the same race and speech as the members of the Russian Orthodox Church who desire to worship according to the Eastern, or Byzantine rite, but still owe allegiance and obedience to the Holy See (Roman) instead of the Holy Synod (Russian).
Greek Catholic churches which use the Byzantine, or Eastern rite, but acknowledge the supremacy and primacy of the Pope, and differ in no essential dogma from the Roman Catholic Church, are designated as “Uniat,” i. e., united with the Roman Catholic Church.
“Uniat,” when joined to the name of any Eastern church with a rite of its own, signifies that it is united with the Roman Catholic Church, while *372 “Orthodox,” joined to the name of an eastern church, signifies that it is not under the jurisdiction of the Holy See, but is under the jurisdiction of the Holy Synod.
If the name of the church here in question was the “St. John’s Greek Catholic Uniat Church,” and the,organization and dedication were in accordance with such name, it would signify a well-defined religion, while if it was a “Russian Greek Orthodox Church” that would signify a separate, distinct and different religion.
This much has been said simply to indicate that we find that while the religions are similar in many respects, they are not branches of the same church, but are two separate and distinct religions or creeds, having different ceremonials, discipline and government.
A church bearing the name and designated in the articles of incorporation as the “St. John’s Greek Catholic Congregation,” as in the case at bar, may be either “Uniat” (connected with the Roman church), or “Orthodox,” that is, a part of the Russian Orthodox Church, depending upon the intention of the members constituting the Congregation.
The all-important question of fact in this case is: Which kind of a church organization is the St. John’s Greek Catholic Congregation ? Is it Uniat, or Orthodox, or independent?
The Church was incorporated on January 15, 1901, at which time the Greek Catholic Uniat Churches in America were, in spiritual matters, in charge of the Roman Catholic Bishops of the various dioceses in which the churches were located, the Roman Pontiff not having at that time ap *373 pointed a Uniat Greek Catholic Church Bishop in the United States'to take charge of the people of his nationality of the Greek Catholic Uniat faith in this country.
Such a Bishop, the Rt. Rev. Stephen Ortynsky, was appointed in the year 1910.
When this Church was organized the Articles of Incorporation provided as follows:
“Said corporation is formed for the purpose of to keep religious services and worship according to the Greek Catholic Rites and customs and ways, and to keep a religious school for children of said denomination, and to do works of charity, and to establish and keep up institutions of and for charity.”
These articles provide for religious services and worship “according to the Greek Catholic Rites and customs and ways,” without indicating whether it is to be “Uniat” or “Orthodox,” and the name of the corporation-is equally indefinite on that question and no light thereon is found by a reference to the original by-laws and regulations.
In the case of Greek Catholic Church v. Orthodox Greek Church, 195 Penn. St., 425, which is a case similar to this, it is observed, at page 433, that:
“This then is a case where from the writing creating the trust, we are unable to discover what particular form of worship was intended or to which of the two churches the name of Greek Catholic Church is to be applied. And therefore according to doctrine laid down by Lord Eldon * * * ‘when a house is created for religious worship and it cannot be discovered what was the nature of the worship intended by it, it must be implied from the *374 usage of the congregation; and that it is the duty of the court to administer the trust in such manner as best to establish the usage, considering it a matter of implied contract with the congregation.’ ”
All of the priests since its organization were “Uniat” priests, and the priest in charge when the property was acquired was ordained by a Bishop under the jurisdiction of the Roman Pontiff, and received his jurisdiction of the Parish from the Roman Catholic Bishop of the Cleveland Diocese; he acquired title to the property and deeded it to the congregation, but there is nothing in the deed which determines or tends to prove whether it is a Uniat or an Orthodox Church.
The Congregation, previous to its incorporation, worshipped in a Roman Catholic chapel, and, as has been said, we find from the evidence that the priests in charge of the organization from the beginning, until the coming of the defendant, Rev. Joseph J. Takach, were Uniat priests, and that the Congregation recognized the Roman Catholic Bishop of the Diocese of Cleveland as having authority over the Church in spiritual matters; and after the appointment by the Roman Pontiff of Rt. Rev. Stephen Ortynsky to have charge as Bishop of the Uniat Greek Catholics in the United States the Congregation recognized the authority of the Roman Catholic Church over the Congregation in spiritual matters by paying fees, sometimes denominated salary, to the Bishop, and at other times denominated as “fee” to the Bishop’s See, and by accepting priests whose jurisdiction over the Parish was conferred by the Bishop of the Roman Catholic Church.
*375 In May, 1909, differences arose among the members of the Congregation, not concerning matters of faith or doctrine, but as to whether the Church should be moved to a new location. Suit was brought by members of one faction against another faction, and in that suit it was alleged that the Church was located in the Roman Catholic Diocese of Cleveland, and formed one of the body of Catholic Churches comprising such Roman Catholic Diocese. That suit was settled, one faction retaining the property, the use of which is involved in this suit, and the other faction taking certain funds in bank belonging to the Congregation, with which to build a church at the location at which they desired the church to be moved.
That agreement contained the provision that such funds should be held “in trust for a nezv congregation of Uniats of the Greek Catholic faith,” and that “it is understood that the word ‘Uniat’ as herein used, means United Greek Catholic, practicing the ancient Greek Catholic Rites and Customs, but, nevertheless, acknowledging the supremacy of the Pope of Rome,” and that “both the parties to this agreement, enter into the same by the authority and with the consent of Rt. Rev. John P. Farrelly, Bishop of the Diocese of Cleveland, Ohio.”
In June, 1910, a Uniat priest in charge of the Congregation was removed by suit prosecuted by the Trustees of the Church, because he had failed to secure authority to act as such priest from the Roman Catholic Bishop of the Diocese, and such action of the Trustees was formally approved by *376 resolution later adopted and signed at a meeting of the Congregation.
In 1910, as has already been said, the Roman Pontiff appointed a Uniat Gréek Catholic Bishop in the United States to take charge of the people of that faith in this country, who had theretofore been under the care and charge of the Roman Catholic Bishops in the various dioceses. On August 10, 1910, a meeting of the Congregation was called by a member thereof, by notice published in the “Cleveland Press,” for the purpose of amending the by-laws and regulations of the Congregation, which contained no specific statement of religious affiliation. As amended at that time the by-laws and regulations provided as follows:
“In religious services and ecclesiastical functions the St. John’s Greek Catholic Congregation acknowledges the religious authority of Rt. Rev. Stephen Ortynsky, or .in case of his death or resignation or cessation of his authority as Bishop in the State of Ohio, that of his successor in the same faith, rite and nationality.
“But nothing in these regulations shall be construed so as to invest any ecclesiastical authority with the title or control over any of the property of this congregation, - nor so as to divest either the Board of Trustees of this Congregation of absolute title and dominion over the same.
“The Right Rev. Stephen Ortynsky during his authority as aforesaid or his successor, as well as the pastor or priest of this Congregation shall be members ex-officio of the Board of Trustees.
“The Board of Trustees are hereby invested with the authority, at all times, to select and appoint the *377 Pastor of this Congregation, or Priest of said Congregation, and to fix the term of his office, as well as his salary.
“But no Pastor or Priest or Teacher of the Congregation shall be selected or appointed unless he shall have come from Hungary, and no Pastor or Priest shall be selected or appointed by the Board of Trustees, unless he is or has been duly married, and is duly authorized to hold Mass, make confirmation and render religious services generally according to Greek Catholic rites and customs and ways.”
(It may be noted in passing that plaintiffs recognize that the title to the property should always be in the Congregation, but in trust, nevertheless, for the purposes for which it is claimed it was dedicated. )
On November 6, 1910, a meeting was held, which was called by the Priest in charge of the Congregation by announcing the meeting in Church on three successive Sundays, at which meeting the bylaws were further amended, as follows:
“Article I. The aforesaid Congregation will always be connected and united with the One Holy Catholic Apostolic Church, which recognizes the Catholic Archpriest Roman Pope as seeing head on earth in the Church of Christ. The aforesaid Church, however, uses in all its divine services, the Greek Catholic rite only'in the ancient Slav language, and in this it is distinguishable from the Roman Catholics, who use the Latin rite. In this Church let them be keeped all rights and privileges of the Greek Catholic Church, so, as in the old Country. The aforesaid Congregation wants Greek *378 Catholic and married Hungary-Rusynian (English: Ruthenian) or Hungary Slovakish Priest, (such as are in old country, in Hungary), who is born in Hungary or in America learned, ordained, appointed by Greek Catholic Bishop of United States in America (who must be duly appointed always by the Roman Pope) or must be descendant of Greek Catholic Hungary-Rusynians (English: Ruthenian) or descendant of Greek Catholic Hungary Slovaks, descendants of Greek Catholic American citizens.
“Article II. Said Congregation and its Church, with all belongings hereto, shall always be under the jurisdiction and under absolute supervision of Greek Catholic Bishop in the United States, who is appointed by the Roman Pope, which is present Greek Catholic Bishop in the United States of America; Right Rev. Stephen Ortynsky, and in case of his death or resignation, of his rightful succeeding Bishop of the same rite, duly appointed by the Roman Pope and no decision of the Church members, nor trustees of the Church, can deprive him n,or his successors from these rights, jurisdiction and authority over the said Church. Said Bishop or his rightful successor shall keep for all the time the church properties entirely in his own trust, so that said Church could not fall into the hands-of some people of other religion or nationality and the temporal administration of the church fortune is in the hands of the church' officers, under the supervision of the aforesaid Greek Catholic Bishop. Only the whole congregation by a majority of votes shall have a right to borrow money, to sell or transfer the properties of the *379 church but only with the consent, confirmation and sanction of its Greek Catholic Bishop, otherwise every such act will be illegal and invalid.
“Article IV. * * * Only Greek Catholic Priest, having jurisdiction from his Greek Catholic Bishop, can hold services in the aforesaid Church, and be one among officers without being elected. * * * The Rector is appointed and called away by the Greek Catholic Bishop.
“Article VIII. To make any change of this constitution a written permission from the Bishop is required. * * * This constitution and by-laws bind every member of this congregation from their approval * * *.”
These by-laws were signed by many members of the Congregation, and later approved by Bishop Ortynsky and recorded in the records of the county.
While there is a conflict in the testimony, we find that the evidence preponderates in favor of the claim that these by-laws were duly adopted, and were unquestioned until the coming of the present Orthodox Priest in 1918.
In 1911, the Congregation made application to the court for authority to encumber the church property, and it was therein stated that the petitioners desire “in conjunction with the Rt. Rev. Stephen Ortynsky, the Greek Catholic Bishop of the United States, who is appointed by the Roman Pope,” to borrow five thousand dollars.
And a like petition containing a like statement was filed in 1913 to borrow thirty thousand dollars, and Bishop Ortynsky, the representative of the Roman Pontiff, signed the mortgage which was authorized by the court.
*380 In 1913 the present church edifice was duly dedicated, and we find that it was dedicated and the cornerstone laid, as a Uniat church, no Orthodox priest or representative having any part in the ceremonies or being present.
Nowhere in the records of the Church does there appear the word “Russian,” or “Orthodox,” up to February 24, 1918, when the present Orthodox priest arrived.
At the close of his first sermon he announced that a meeting would be held, and the congregation remained for such meeting. There is a dispute in the evidence as to how many members remained throughout the meeting, but an attempt was made to change the organization from Uniat to Orthodox, and a paper to that effect was signed by some members, and later by others, so that it finally received the written approval of sixty-nine members out of a total of from three to five hundred members. After this meeting, a new minute book was provided, and therein the Church is denominated the “Russian (Uhro) Orthodox Greek Catholic Church of St. John the Baptist.” This book was prepared by defendants in this action under the direction of the present Orthodox Priest, and it is there recorded that “the members of the congregation unisono decide not to be from today on under the Uniat slavery, and submit themself to the Orthodox authority. To the Uhro-Russian Orthodox Greek Catholic Bishop, Stephen, and give power to the rector, Rev. Joseph J. Takach, and to the trustees of the Congregation to make all the necessary things which are wanted by the Church authority, the Uhro-Russian Orthodox Diocese, *381 with Bishop Stephen at the head of it. Under those things was explained the change of charter to the orthodox charter, and acknowledgment in the deeds of parochial and church property as first trustee the Bishop as second the priest, and four (4) civil members of Congregation, who also are elected trustees at the yearly congregational meeting, and the members of good standing have at the yearly meeting elect new ones, are have the right those four (4) approve for the next year too. By the change of the charter power is given to the Trustees to make new Congregational by-laws of Orthodox character.
“The salary of priest, Rev. Jos. J. Takach was fixed unisono $100.00 monthly, and $10.00 for church wine and bread monthly.
“Unanimously decided, that the trustees with the priest, Rev. Joseph J. Takach at the head, have power to take care of buying ground for cemetery. Temporarily the burials will be at the Russian Orthodox cemetery.”
The latter part of this quotation shows that it was unanimously decided that the trustees, with the priest at the head, should have power to take care of buying ground for a cemetery. (The congregation had theretofore used the Roman Catholic Cemetery, which was not allowable if it was an Orthodox church.) It is in evidence also that the title to the property up to this time had been in the name of St. John’s Greek Catholic Congregation, not having been transferred to the trustees of the Congregation, who acted for it from time to time, but in February, 1918, without any formal action of the Congregation, and without any application to the *382 Court of Common Pleas, an attempt was made to transfer the property by deeding it in the name of the Congregation, by deed signed by Rev. Takach, as President, and one of the members as Secretary, to J. P. Ferencik, who immediately deeded it to the then trustees of the Church and to Rt. Rev. Stephen Dzubay, the Orthodox Bishop, and at about the same time an attempt was made to amend the Articles of Incorporation so as to declare that it was an Orthodox Church.
From the record, only a part of which we have referred to, we find that up to the arrival of the present Orthodox priest this Congregation was Uniat and its property had been dedicated and used as such, and that the Orthodox priest recognized that as a fact and attempted to change this situation and divert this property from the uses and purposes for which it had been acquired, dedicated and used.
It may be that at the present time a large majority of the members are in sympathy with this change, but the heat of the controversy which has been raging for some time among the membership is not conducive to deliberate and well-considered judgments, and there is no way by which it may be determined how much of the present opinion is due to the presence and activities of the present Orthodox priest.
If this property was dedicated by way of trust for the purposes of sustaining, supporting and propagating definite religious doctrines or principles, known as the Uniat faith, and there are persons willing to teach such doctrines or principles, and there are members so interested in the execu *383 tion of the trust as to have a standing in a court of equity, they may invoke the power of such court' to prevent the diversion of the property to other and different uses. If there is a trust confided to a religious corporation, even though it be of the independent or congregational form of government, it is not within the power of the majority of that congregation, however preponderate, by reason of a change of views on religious subjects, to carry the property so confided to them in trust to the support of a-different doctrine. To justify the application of this rule of law the trust and the abuse of it should be clearly established. We think that has been done in this case. This property was clearly held in trust for the purpose of religious worship and teaching; the form of worship and the doctrine intended cannot be discovered from the deed, and in that event we must look to the usage of the Congregation and the nature of the original institution as a guide for the decision of the court between rival factions.
We hold that the evidence clearly establishes that the Congregation has been Uniat from the beginning, and never Orthodox until the coming of the present priest; that the property was so dedicated and used, there being no protest or attempt to change such use until the arrival of the present Orthodox priest; that to change to Orthodox would be a real and substantial departure from the purposes of the trust, amounting to a perversion of it.
A decree may be drawn enjoining defendants from permitting any person to officiate as priest and rector of said Congregation other than one duly qualified and appointed as such by the Greek Cath *384 olic Bishop in the United States, appointed by the Roman Pope, and enjoifiing the defendant Joseph J. Takach from preaching, teaching or officiating in said church as alleged priest or rector thereof, and from occupying or in any way using or interfering with the property of said Church or Congregation, and declaring the alleged sales and transfers of said real estate invalid and restoring the title to the property to the Congregation, subject to and charged with the trust hereinbefore found to exist, and also declaring void the attempted amendments to the articles of incorporation and the rules, regulations and by-laws, by which it was attempted to change such organization from Uniat to Orthodox.
Mr. Wilfred J. Mahon, for plaintiffs.
Messrs. Rocker & Schwartz and Mr. T. S. Dunlap, for defendants.

Decree of injunction for plaintiffs.

Vickery and Ingersoll, JJ., concur in decree.