St. Michael's Ukrainian Greek Catholic Church of
Woonsocket, Rhode Island *vs.* Constantine
Bohachewsky *et al.*
Constantine Bohachewsky *et al. vs.* St. Michael's
Ukrainian Greek Catholic Church of Woonsocket,
Rhode Island, *et al.*

JANUARY 25, 1938.

Present: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

2

4

CONDON, J. These are two bills in equity which were heard together on bills, answers, replications and proof in the superior court and resulted in a decision in each case against Constantine Bohachewsky et al. From the final decrees, based upon such decisions, appeals have been duly prosecuted to this court. The reasons of appeal are substantially that the decision of the trial justice in each case is contrary to the law and against the evidence and the weight of the evidence.

The suits concern the title to certain real estate and personal property situated in the city of Woonsocket and the right to use said personalty, and to use and occupy said realty for certain specified religious purposes. There is also involved the right of Constantine Bohachewsky to appoint and remove the pastor of the religious congregation entitled to the use and occupancy of the property.

In Equity No. 1324, filed in the superior court on August 19, 1926, the respondents are Bishop Bohachewsky and the Reverend Chlib Werchowsky, the pastor of St. Michael's Ukrainian Greek Catholic Church of Woonsocket, Rhode Island, by appointment of the said bishop.

The co-complainants of Bishop Bohachewsky in Equity No. 1325, filed in the superior court on January 7, 1935, are the trustees of St. Michael's Ukrainian Greek Catholic Church as now functioning. The second respondent in that suit is the St. Michael's Ukrainian Orthodox Church of Woonsocket, Rhode Island, a corporation hereinafter described.

Constantine Bohachewsky is the Ukrainian Greek Catholic Bishop in the Ruthenian Rite in the United States, duly appointed by the Pope of Rome. He is the successor of

Bishop Steven Ortynski who held that episcopal office from 1907 until his death in 1916.

.Saint Michael's Ukrainian Greek Catholic Church of Woonsocket, Rhode Island, is a Rhode Island corporation, incorporated originally on November 22, 1909, under the name of St. Michael's Greek Catholic Ruthenian Church of Woonsocket. The substitution of the word "Ukrainian" for the word "Ruthenian" in the name of that corporation was unanimously agreed to June 3, 1923. This change was motivated largely by the revival of the national spirit of the Ukraine among the Ukrainians of Woonsocket, but it was admitted that the change of name was otherwise of no significance in the present litigation.

Saint Michael's Ukrainian Orthodox Church is a Rhode Island corporation, incorporated December 4, 1928, as a result of the action taken at a meeting of St. Michael's Ukrainian Greek Catholic Church, held on August 15, 1928. Immediately upon incorporation, it took over and is now vested with the record title to all the property of St. Michael's Ukrainian Greek Catholic Church of Woonsocket, Rhode Island, which is involved in these suits.

In the earlier suit after a hearing on a prayer for a preliminary injunction, a decree was entered on August 27, 1926 in the superior court, enjoining Constantine Bohachewsky, Chlib Werchowsky and others, until further order of the court from interfering in any way with the holding of religious services in said church, and from exercising any control over the property of the same or attempting to use or occupy it, except that the respondent Werchowsky, for a certain period stated in the decree, was permitted to occupy the parish house, which said Werchowsky was already occupying when this suit was brought.

On the ground that the trial justice, in entering said interlocutory decree and thus disturbing the status quo had abused his discretion, an appeal from this interlocutory decree was taken to this court. On April 17, 1927, this court,

**6**

with one justice thereof dissenting, denied and dismissed this appeal. (48 R. I. 234) In its opinion the court discusses, to some extent, on the incomplete evidence then before it, the merits of the cause then pending in the superior court, although such merits were not before it on the appeal from this interlocutory decree. But it clearly appears from the concluding portion of the opinion that the court properly confined its *decision* to the question of whether or not the trial justice had abused his discretion in enjoining these respondents, and sent the case back to the superior court for *further proceedings*.

The dissenting justice took the ground that the granting of the mandatory injunction, removing those in possession and thus altering the *status quo,* was clearly an abuse of discretion on the part of the trial justice, and not supported by the precedents in this state and in other jurisdictions. (see 48 R. I. 234, 236) His position was that the parties should be left *in statu quo,* until the final hearing on the merits, thus, in effect, compelling the complainant to press its suit promptly and seasonably to obtain a final decree. In the light of after events, it now appears that such would have been the wiser course. As it was, the complainant, having obtained possession of the church property by virtue of the preliminary injunction, neglected to press its suit and subsequently acted as though the decision in this interlocutory matter was a final determination of the cause on the merits in its favor. On August 15, 1928, a little more than a year after the decision of this court and without taking any further steps in the superior court to have its bill heard, the complainant voted to transfer all of its assets to an entirely different religious corporation and thereafter permitted its own corporate existence to cease by reason of noncompliance with the state law governing its creation. It was thereafter revived by the adherents of the bishop.

Finally, on March 11, 1935, the respondents in that case filed their written motion in the superior court that it be

assigned for hearing, they having previously, on January 7, 1935, brought their own bill, Equity No. 1325, for affirmative relief in the same matter against the complainant corporation in the earlier suit and St. Michael's Ukrainian Orthodox Church of Woonsocket, Rhode Island, the new corporation to which St. Michael's Ukrainian Greek Catholic Church of Woonsocket, Rhode Island had, as previously stated, made a deed purporting to transfer all of its assets.

The hearing on both bills was commenced on April 2, 1935, and continued intermittently until it was concluded on June 13, 1935. The trial justice then reserved decision, and later, on October 4, 1935, filed his written rescript, containing forty-two findings of fact and several specific rulings of law, upon which he founded his decision in favor of the complainant in the earlier case, Equity No. 1324, and also in favor of the two respondents in the later case, Equity No. 1325.

The record is voluminous. It comprises over fourteen hundred pages of testimony and an immense quantity of documentary evidence. Much of this documentary evidence is in the Ukrainian language, and portions of it, considered by counsel on both sides as essential to a proper understanding of their respective contentions, were translated during the course of the hearing in connection with the testimony of various witnesses, who were permitted to testify as to the correctness of certain statements recited in such documents.

From our examination of this evidence and a consideration of the peculiar nature of much of it, we have been impressed with the heavy burden which must have been imposed on the memory of the trial justice when he came to make his decision, notwithstanding such aid as he may have received from the notes which he took of the testimony as it went in at the hearing. And in this connection, we may observe that the aid which we have had from the transcript of the testimony constantly available to us, in addition to

the able and comprehensive briefs presented by counsel, has been invaluable. Without the transcript of all the evidence, it would be an easy matter in a case of this character to fall into error as to the effect of a good deal of the testimony, coming as it does from witnesses testifying in an alien tongue and pertaining to the accuracy of the record of certain events, which had occurred at meetings of this church corporation many years before.

The facts brought out by this testimony are not always clear, and frequently, when some fact is confidently stated by a witness, it is clearly contradicted by his own conduct relative to such fact. The record is full of such instances and they have a vital bearing on the proper determination of the issues involved. There is also, however, a considerable body of admittedly undisputed evidence, which is of a decisive character, as we view it, in determining whether the findings of the trial justice are clearly erroneous. We have carefully considered the record with these things in mind, and we find that the evidence does not support in full the findings of the trial justice.

In the interest of a clear understanding of the issues involved in these cases we shall first state the facts and also something of the racial and religious background of the parties as we glean them from the evidence. The real difference between the parties is more over what deductions are properly to be drawn from these facts than over what is the correct law applicable to the facts. Such contention as there is over the law will be considered at the conclusion of our consideration of the facts.

The people, represented by the parties to these suits, are Ukrainian. They came from Galicia, now a part of the Republic of Poland but formerly included in the old Austro-Hungarian Empire. These people, however, know and speak of their homeland as Western Ukraine, because it is the western part of ancient Ukrainia. On the other hand, the eastern part is referred to as Eastern Ukraine and is now a

part of Soviet Russia. It is now organized as the Soviet Republic of the Ukraine in the Union of Soviet Republics of Russia. These two territories, together with adjacent districts of smaller size in neighboring countries of southeastern Europe, thus constitute the domain of ancient Ukrainia. In modern times, however, Ukrainia has never enjoyed a separate national existence, although her people have apparently clung tenaciously to the hope that once again she would take, among the nations of the world, the independent place which she held in southeastern Europe in the twelfth century.

In religion the people of Western Ukraine, that is Galicia, are members of the Greek Catholic Church in union with the See of Rome. They are not Roman Catholics but are one with that body in all essential matters of faith and doctrine and they recognize the Pope of Rome as the visible head of their church on earth. In some matters of ecclesiastical rites and discipline, which they deem important, they differ from their brethren of the Roman Church, and this is particularly so as to their rite. They do not worship in the Latin rite as to Roman Catholics, but in the Ruthenian rite, which is a form of the Byzantine rite, except that the language used is not Greek but old Slavonic. These people have long been known, consequently, as Uniats because of the union of their church with the See of Rome.

On the other hand, their brethren in Eastern Ukraine in Russia are largely members of the Greek Orthodox Church and before the Russian Revolution were all under the ecclesiastical rule of the Holy Russian Synod at Moscow, which is not in union with Rome. Since the Revolution, many of the adherents of that faith joined other churches or organized new sects. Of the latter class was a group of Ukrainian Orthodox clergy and laymen who assembled at Kiev in Eastern Ukraine, sometime in 1921 or 1923, and set up what they called the "Ukrainian Autokafalic Orthodox Church." This church, however, was

never recognized as Orthodox by any ruling authority of any of the branches of the Eastern Orthodox Church, and so they elected one of their own number as the head of the church and made him their archbishop. As such archbishop he, thereupon, in turn, created other bishops. Thus this church was organized with a hierarchy which, it was admitted in these cases by a clerical witness for the Autokafalic group, had no claim to apostolic succession.

This church, according to the evidence, no longer exists in the Ukraine, because it was suppressed by Soviet Russia. It is claimed that it does continue nevertheless to exist in the United States, and that the St. Michael's Ukrainian Orthodox Church of Woonsocket, Rhode Island, one of the respondents in the later case, Equity No. 1325, is a member of this Autokafalic Church by virtue of the vote passed at the meeting of the corporation of St. Michael's Ukrainian Orthodox Church of Woonsocket, Rhode Island, held on January 2, 1929.

It is also claimed by this group, which we shall hereafter refer to as the Autokafalic group, that they are a large majority of the congregation and of the corporation of old St. Michael's Ukrainian Greek Catholic Church; that said St. Michael's Church was, and always had been, an independent religious society; and that, as such, a majority of its members had the lawful right to manage and control its property, appoint and remove the pastor of said church and also control its religious teachings. They claim further that a majority of the old corporation and congregation had held a valid meeting on July 14, 1926, and expressly repudiated the attempted supervision and control of Bishop Bohachewsky and that, at a subsequent valid meeting of August 15, 1928, such majority voted to transfer all of the property to a new corporation, St. Michael's Ukrainian Orthodox Church of Woonsocket, Rhode Island, not then in existence but created later, on December 4, 1928, and regularly organized on January 2, 1929.

The bishop and his group, which we shall hereafter call the Uniats, contend, on the other hand, that from its very inception in the year 1909 old St. Michael's Ukrainian Greek Catholic Church was a Uniat church, that is a Greek Catholic Church in union with the See of Rome, and subject to the supervision and control of the ruling authority of said See; that it was, therefore, not an independent religious body of the congregational type; and that the management and control of its property was subject to the approval of the bishop, duly appointed by the Holy See. They also contend that the purported action of the meetings of July 14, 1926, and August 15, 1928, were of no force and effect to change the religious status of said St. Michael's Church, and that the right to appoint and remove the pastor of said church was vested in the said Bishop Bohachewsky as the duly appointed bishop of the Greek Catholic Church in the Ruthenian Rite in the United States, in union with the Holy See at Rome.

In support of these claims and contentions, the Uniats have, in addition to other evidence tending to prove the same introduced, as exhibits in these cases, two sets of by-laws alleged by them to have been adopted at certain duly called meetings of St. Michael's Ukrainian Greek Catholic Church of Woonsocket, Rhode Island, the first at the inception of the corporate form of management of the church property at a meeting held on January 2 and 5, in 1910, and the second set at a meeting held on June 3, 1923. These alleged by-laws, among other things pertaining to the conduct of the affairs of the corporation, provide in express terms for the approval by the bishop of certain corporate actions, for appointment and removal of the pastor of the church by the bishop, and expressly for affiliation of the church with the Greek Catholic Church in union with the Holy Catholic and Apostolic Church at Rome.

These by-laws are attacked by the Autokafalic group, who claim that no such by-laws were ever adopted. They

further contend that after the corporation was "adopted" in 1910 no by-laws were ever adopted to regulate its affairs.

Whether or not this church corporation functioned from 1910 down to July 14, 1926 without any body of rules and regulations to govern the conduct of its meetings, the selection of its officers and the management and control of its property is therefore one of the important issues to be decided. But the most important question is whether or not the religious congregation for whose benefit this corporation was chartered was at that time an independent religious society of the congregational type or a subordinate member of a general church body, which had a superior ruling authority over its subordinate members; and whether or not its original religious status, whatever it was, as a voluntary society, continued to be the same after it became a corporation.

If this church is a member of the Greek Catholic Church in the Ruthenian Rite in union with Rome, then it is a subordinate church constituting a part only of a general church body, and all of the property which it has acquired is dedicated to the doctrines and uses of that church. The preliminary question is one of fact. Was St. Michael's Ukrainian Greek Catholic Church in the beginning a Uniat Church?

The trial justice has found that it was not. He states in his rescript that, while it was a voluntary society previous to its incorporation, this society was composed of Uniats and other members who desired it to be independent, in respect both to the control over its property and to the appointment of pastors, and that the latter were largely in the majority. He further finds that the society never agreed before its incorporation to subject itself, in the matters of property or the appointment of its pastor, to the ecclesiastical authority of the Greek Catholic Church in union with Rome.

These particular findings have nothing to do with the question of whether or not by-laws pertaining to these mat-

ters were later adopted in corporate meetings. They represent the conclusions of the trial justice on the evidence only as to the nature and character of the original assembly of these people for religious worship before their society was incorporated. Since the answer to that question has a vital bearing on the later .actions and conduct of the members of the society under their corporate organization, it is quite properly put first in the order of consideration. Whether by-laws were adopted under the corporate charter, and, if so, whether either or both sets of by-laws above-mentioned were adopted, are questions which are separately considered hereinafter.

We are unable to agree with these findings of the trial justice, as we are clearly of the opinion that the great weight of the evidence is to the contrary. In reaching this conclusion, we have carefully considered not merely the testimony of the witnesses who took the witness stand and testified what they believed and understood was the character of the religious society of which they were members, but also their personal conduct in connection with the religious observances that were continuously and consistently practiced by the society, including themselves.

We have also not overlooked the significance of the faith of the priests who came to minister to these people when assembled for public worship and what ritual these priests followed in the exercise of their office at such times. Another phase of the evidence to which we have given due weight was the manner in which the society obtained the services of such priests and from whom they sought them.

It appears from this evidence that sometime in 1904 or 1905—one witness puts it as early as 1903—a number of Ukrainians, having settled in Woonsocket and Manville, Rhode Island, organized a religious society under the name of St. Michael the Archangel, primarily for bringing to its members the opportunity to continue in their new home the practice of the religious faith which they had followed in their homeland. They, accordingly, obtained the use of an

abandoned Protestant church at Cumberland Hill, Rhode Island, and then purchased various religious articles of personal property needed for the performance of certain religious rites of their faith. All of the members of this society were Ukrainians from Galicia, where admittedly they were members then of the Greek Catholic Church in union with Rome.

When they came to Woonsocket in those early years they found there no church of their faith. Although there were several parishes of the Roman Catholic Church and a number of congregations of various Protestant denominations in the city, these people preferred to worship as they were accustomed to in Galicia. Apparently they were firmly attached to their own faith and were prepared to make the necessary sacrifices to establish a church of that faith in Woonsocket, or in an adjacent locality. However, it was difficult at this time to obtain a priest of their faith to serve them regularly and for a number of years they were obliged to depend on such Uniat priests who, being in New England, occasionally came to Woonsocket at their express request to offer the sacrifice of the Mass for them.

During those years there were only a few of such priests in this country and they appear to have been sent here by, or to have come here with the approval of, the Metropolitan Archbishop of Lemberg in Galicia in order to minister to the increasing numbers of Ukrainian Greek Catholics who had emigrated from Galicia to this country. The Greek Catholic Church in the Ruthenian Rite in union with Rome had not then been organized in the United States, but later in the year 1907, the Right Reverend Steven Soter Ortynski was appointed by the Holy See Bishop of all Ukrainian Catholics in this country and his See established at Philadelphia, Pennsylvania. He was given authority to organize Ruthenian Greek Catholic parishes within the territorial limits of any diocese of the Roman Catholic Church with the approval of the ordinary of such diocese. Later in the year 1912, Bishop Ortynski was given full ordinary juris-

diction independent of the approval of any Roman Catholic Bishop anywhere in the United States. The Greek Catholic Church in the Ruthenian Rite was thus organized, in a limited way, in this country in 1907, and in 1912 it was organized as completely as it was in Galicia, subject only to the Pope of Rome, as was the Metropolitan Archbishop of Lemberg, according to the Union of such Greek Catholic Church with the Holy See.

Now, in the same year, 1907, when Bishop Ortynski assumed his episcopal duties, some differences had arisen among the members of St. Michael's society at Manville, over continuing their worship in the Greek Catholic Ruthenian Rite, as they had been doing since the society was founded. The dissenting members absented themselves from further meetings of the society and declared in favor of the Russian Orthodox Church. After some negotiations between the society and the dissenters, it was finally agreed that the latter should be permitted to withdraw in peace and have the use of the rented property of the society at Cumberland Hill, Rhode Island. But all the articles of personal property in the church were taken by the society. The dissenting members thereupon organized the Russian Orthodox Church of St. Mary of Manville, and remained in that place while St. Michael's Society removed its place of meeting to a hall in Woonsocket, where it continued, as from the beginning, to be served exclusively by priests of the Greek Catholic Church in union with Rome. There is no evidence that the society ever at any time sought the services of a priest of any other faith, and when it could not obtain a Uniat priest, it did without any clergy.

That those who remained in the society and established it in Woonsocket were firmly attached to the Uniat Church is well illustrated by this event; and this is further emphasized by a very significant action which they took through a formal vote of the society shortly after going to Woonsocket. Sometime in 1908 it was duly voted by the society that a committee be appointed to request Bishop Ortynski

to send a priest to Woonsocket to stay among them and organize a parish. As a result of this action, the bishop, with the approval of the Roman Catholic bishop, sent Father Michael Struminsky to take up this work.

Sometime in the early part of 1909, Father Struminsky came to Woonsocket and, in accordance with the above request, and with the cooperation of the membership, the existing society of St. Michael was organized formally by him into the parish of St. Michael's Greek Catholic Ruthenian Church. There was no dissent on this matter among the members at this time. All of the witnesses on both sides of this controversy, who were then members of the society, testified that they were Greek Catholics and that they became and continued to be members of said parish.

Some of the witnesses for the Autokafalic group testified that they did not understand that their church was united with Rome. But they admitted that they went to church and heard Mass offered by the priest and that prayer was offered specifically for the Pope by name as the visible head of the church and for the bishop. These same witnesses also admitted that they were members of the Greek Catholic Church in Galicia before they came to this country and that the church they belonged to in Woonsocket under Father Struminsky was the same kind of a church as that to which they belonged in Galicia. They did not deny that Bishop Ortynski sent Father Struminsky to Woonsocket at the request of St. Michael's Society and that he organized the parish of St. Michael, but they say now that they did not understand that their church was to be a part of the general church body over which, in the United States, Bishop Ortynski was appointed by the Pope to rule. Such testimony is far from convincing. The conduct of these witnesses at the time in attending services at the church conducted in the Ruthenian Rite and in accepting the ministrations of the Uniat priests—and particularly their silence then and in the seventeen years that followed—are totally at variance with such testimony.

We are of the opinion that this congregation from its inception was desirous of forming a local church of the ancient faith which all of its members professed and practiced and that in pursuance of that desire they sought and received the assistance and approbation of Bishop Ortynski, and established in Woonsocket St. Michael's Greek Catholic Ruthenian Church.

After having accomplished this purpose they next proceeded to acquire a place of worship and a residence for their pastor. Accordingly under the leadership and direction of Father Struminsky they acquired, in 1909, a building on West School street in the city of Woonsocket and took title thereto on April 1, 1909, in the names of two members of the congregation, Jacob Mostecki and Martin Halas, in trust for the society, as the church corporation had not at that time been organized. There was no express declaration of trust in the deed for the benefit of any specific religious denomination, but from what we have said above it is clear that this property was acquired for the uses and purposes of St. Michael's Greek Catholic Ruthenian Church and that those uses and purposes then were the promotion and maintenance of public worship according to the ritual and doctrine of the Greek Catholic Church in the Ruthenian Rite in union with Rome. By their long continued conduct they clearly dedicated this property to such uses and purposes.

There seems to be some misapprehension that, because this congregation did not take any formal vote to affiliate their church with the general body presided over by Bishop Ortynski and make formal submission to him as their ecclesiastical ruler, it was therefore independent and that as to the right to devote its property to any particular religious use it came within the second class of religious societies described in *Watson* v. *Jones,* 13 Wall. 679 at page 724 as being a "strictly congregational or independent organization, governed solely within itself, either by a majority of its members or by such other local organism as it may have

instituted for the purpose of ecclesiastical government; and to property held by such a church, either by way of purchase or donation, with no other specific trust attached to it in the hands of the church than that it is for the use of that congregation as a religious society." That is not so. Such formal action is not an indispensable requisite for bringing a local congregation into a more general church body and making it a subordinate member of such body. The essential fact to be determined is what faith the congregation actually practiced and thereafter consistently adhered to. This may be determined from the forms and usage of the congregation. *Attorney General* v. *Pearson,* 3 Merivale 353; *Greek Catholic Church* v. *Orthodox Greek Church,* 195 Pa. 425. In the latter case the facts were not unlike those in the instant cases, and also involved a Uniat church.

In that case, certain real estate was acquired by deed in the name of one John Kosek of Wilkesbarre, Pennsylvania, as trustee, and a church building and a residence for a pastor were built thereon. There was no declaration of purpose in the deed, but it was understood that Kosek had taken title on behalf of a number of his compatriots for religious uses. Later, upon his death, his widow, Elizabeth Kosek, was appointed trustee in his place and she thereupon conveyed all of this real estate to three persons described as trustees, and that conveyance was declared to be "in trust for the use and benefit of the Greek Catholic Church of Wilkesbarre, Pennsylvania." The congregation sent to Hungary for a Uniat priest to come to Wilkesbarre and serve as their pastor. Such a priest came in response to that request and remained two years. He was succeeded by a second Uniat priest, who remained ten months. The third pastor, Reverend Alexis Toth, was also a Uniat when he came, but later changed to the Orthodox faith and thereupon proceeded to persuade the congregation to do likewise. He succeeded in his endeavor, and a substantial majority of the congregation, in a meeting duly assembled, passed resolutions renouncing the Uniat Greek Catholic Church and authorizing

the church trustees to file a petition in court asking that the church real estate be conveyed to themselves and the Russian Orthodox Church of Wilkesbarre, which they claimed was the proper name of their church.

The claim was made in that case that this church was never really a Uniat Greek Catholic Church and that the people, in the beginning, really desired their church to be Russian Orthodox, but had been kept in ignorance of its true nature by their ecclesiastical leaders. Much evidence was received on this point but the court said, at page 432 of the opinion: "It is enough for us to know that at the time this church was begun there was a 'United Greek Catholic Church', having regular creeds, organizations and all that pertains to any denomination of Christians, and that there was also at the same time, an Orthodox Greek Catholic Russian Church in same condition as to creeds, etc." From the evidence before it, the court further said "that the churches to which a very large proportion of the congregation belonged before coming from Hungary and Galicia were United Greek Catholic churches and that this church prior to the time Rev. Toth took charge of it, was presided over by a United Greek Catholic priest and was to all intents and purposes, a United Greek Catholic Church."

And construing the deed from Elizabeth Kosek, the court observed: "The deed from Elizabeth Kosek, trustee to Mike Jevcsak, Andrew Pevowarnick and Michael Pevowarnick is to them as trustees of the Greek Catholic Church of Wilkes-Barre, Pa., and successors. Under this deed these men might be trustees of the United Greek Catholic Church or they might be trustees of the Orthodox Greek Catholic Church so far as the deed is concerned. By its wording it does not particularly indicate which of the parties to this controversy was intended.

"This then is a case where from the writing creating the trust, we are unable to discover what particular form of worship was intended or to which of the two churches the

name of Greek Catholic Church is to be applied. And therefore according to doctrine laid down by Lord Eldon in *Attorney General* v. *Pearson*, 3 Merivale, 353, affirmed or approved in *Presbyterian Congregation* v. *Johnston*, 1 W. & S. 9, *McGinnis* v. *Watson*, 41 Pa. 9, *Sutter* v. *Trustees of Reformed Dutch Church*, 42 Pa. 503, and Roshi's Appeal, 69 Pa. 462, that 'when a house is created for religious worship and it cannot be discovered what was the nature of the worship intended by it, it must be implied from the usage of the congregation; and that·it is the duty of the court to administer the trust in such manner as best to establish the usage, considering it a matter of implied contract with the congregation.'

"Again, in *App* v. *Lutheran Congregation*, 6 Pa. 201, cited with approval in Roshi's Appeal, 69 Pa. 462, by Justice Sharswood, Justice Burnside says: 'I approve of the doctrine of Lord Eldon in the case of the *Attorney General* v. *Pearson*, 3 Merivale 400, that it is the duty of the court to decide in favor of those whether a minority or majority of the congregation who are adhering to the doctrine professed by the congregation, and the form of the worship in practice, as also in favor of the government of the church in operation with which it was connected at the time the trust was declared.' We must look to the forms and usages of the congregation of this church prior to the controversy, to ascertain what was meant by the words 'Greek Catholic Church of Wilkes-Barre, Pa.' " Following the law as thus declared, the court concluded: "Believing that the evidence clearly shows that the United Greek Catholic Church was the church organization or denomination that was in possession of the church property at the time the trust was originally created, and that they continued in possession of the property up to the time that it was surrendered (by a portion of the congregation who renounced this Church) to the Orthodox Greek Catholic Russian Church, we feel constrained to restrain these defendants from interfering

with the members of the United Greek Catholic Church, who have remained true to the faith of those in possession at the time the deeds were made to John Kosek and also to Mike Jevcsak, Michael Pevowarnick and Andrew Pevowarnick, trustees, etc., in their possession of the church property and in conducting services therein in accordance with the rules and under the forms of the United Greek Catholic Church."

We have quoted at length from this case because of the striking similarity of some of the points raised by the evidence therein with those in the instant cases. In the cases before us an effort was made to show that the people were not Uniats and that in some way the people were kept in ignorance of the fact that their church was united with Rome. The claim was also made, as in the Pennsylvania case, that the deed did not specify any trust that could be determined from the language in it. But it appears to us that the evidence in the instant cases constitutes even stronger proof than in the Pennsylvania case that St. Michael's Greek Catholic Ruthenian Church was always a Uniat church and that when the real estate was acquired it was dedicated to the uses of the Ruthenian Greek Catholic Church in union with Rome.

In *Bakos* v. *Takach,* 14 Ohio App. 370, the above-cited Pennsylvania case was quoted with approval. The situation in the Ohio case was also not unlike the instant cases, and in this opinion we differ from the trial justice, who states that that case is not in point because a by-law was in evidence in the *Bakos* case which provided that the "aforesaid Congregation will always be connected and united with the One Holy Catholic Apostolic Church . . ." A careful reading of the original opinion, and the later one given after a rehearing, will disclose that the court based its decision in favor of the Uniats largely upon the usage and custom which prevailed with the congregation from the beginning, rather than upon any declaration contained in a by-law adopted sometime later. In other words, even though no

such by-law were in evidence, it is clear from the language used by the court that its decision would have been the same.

We also differ with the trial justice as to the pertinency of *Kicinko* v. *Petruska,* 259 Pa. 1, 102 A. 286. In that case the court below, notwithstanding the declaration of use contained in the charter, considered the evidence of the custom and usage of the congregation itself prior to the division thereof and determined from such usage whether or not the church was an independent church. Quoting with approval the language and findings of the court below on this point, the supreme court of Pennsylvania observed in its opinion, at page 6, (102 A. 288): "While the facts in none of the cases we are about to cite are precisely like those at bar, yet the material principles laid down and discussed in these authorities are relevant and controlling; and they fully sustain the view of the law stated in the excerpt just quoted from the opinion of the learned president judge of the court below: See Schnorr's App., 67 Pa. 138; Roshi's App., 69 Pa. 462; Sarver and Others' App., 81½ Pa. 183; *Greek Catholic Church* v. *Orthodox Greek Church,* 195 Pa. 425; *Mazaika* v. *Grauczunas,* 229 Pa. 47, 53."

It is significant that among the cases cited by the court in that case is *Greek Catholic Church* v. *Orthodox Catholic Church,* which we have discussed and quoted from above. Other cases might be cited to the same effect, but any further discussion would needlessly lengthen this opinion. It may be observed, however, that in *Chrapko* v. *Kobasa,* 271 Pa. 447, 114 A. 254 the supreme court of Pennsylvania approved a decision of the lower court, which made the following finding: "Ecclesiastically and historically Greek Catholic and Uniat Greek Catholic are synonymous terms and signify a church which acknowledges the supremacy of the Holy See at Rome."

Much support can be found for this view, although it is denied by some of the witnesses in the instant cases. It is not, however, necessary here to rest our finding on that view.

Rather we rest our decision in the instant cases definitely on the overwhelming evidence of the usage and practices of St. Michael's Church as a Uniat church from the very beginning of its establishment in Woonsocket.

On January 2, 1910, at a meeting of the parish called for that purpose, articles of incorporation were formally adopted 'for the better conduct and order of the temporal affairs of the parish. This corporation was entitled "St. Michael's Greek Catholic Ruthenian Church of Woonsocket." From the above date down to the year 1928, it continued without interruption to be the vehicle by which and through which the business and fiscal affairs of the church were transacted. Regular annual meetings and special meetings duly called for special purposes, notice of which was given in church by the priest, were held, and at each annual meeting five trustees were chosen to manage and transact such affairs for the year ensuing. From these trustees the necessary officers of the corporation were chosen.

The incorporation of the church did not in any way alter the ecclesiastical status of the church. It appears that it was the intention at that time to do no more than to provide a better method of conducting the temporal affairs of this church than by means of a voluntary society. Apparently it never occurred then to any of the members that they were reorganizing their church as an independent church when they organized this corporation. Indeed, it is greatly to be doubted whether these people had any idea of what an independent church was, as the only church with which they were familiar in their native country was one of an entirely opposite character. But, in the more recent past, many of their countrymen have been involved in litigation in which it has been attempted to establish that certain Greek Catholic congregations were independent churches, as known in this country, and some of the witnesses for the Autokafalic group in these cases appear to have been familiar with some of this litigation. Clearly the idea of an independent church is an afterthought in their minds and

was not entertained by them until the instant cases first reached the superior court.

That there was no change in the ecclesiastical status of this church after its incorporation is amply proved by the evidence. Shortly after incorporation, Father Struminsky left and Bishop Ortynski sent a new pastor to succeed him, Father Dorohowicz. He served about a year and was followed by another, Father Turula, who was also sent by the bishop and who served nine years. At the conclusion of his pastorate in 1920, six priests followed him in succession, until 1926 and all of them were Uniat priests sent by the Uniat bishop. There is no evidence whatever in the record that any of these priests were selected by the parish or by the parish trustees, and there is no evidence that the departure of any of these priests was affected by a vote of removal by either the parish at a corporation meeting or by the trustees.

The Autokafalic group now claim that the members of the corporation had the right to dismiss the pastor of the church. If their church was really independent they would have had that right. Yet, when the controversy over Father Werchowsky arose and a parish meeting, which was completely controlled by those now included in that group, was held to express disapproval of him and to get rid of him, they did not vote to dismiss him. On the contrary, they requested the bishop to remove him and send them another pastor. It was also said by one of the leaders of this group at that meeting that they wanted the bishop to know there was "no independent movement in Woonsocket." This expression apparently met with the approval of those present, as there is no evidence that anyone expressed a contrary opinion. Accordingly, the secretary of the parish was instructed to write and did write to the bishop requesting him to come to Woonsocket and settle the difficulty that had arisen between the pastor and the people.

Not until later, after they had retained counsel to represent them in the present litigation, did this group claim that

the local church had the right to appoint and remove its pastor and that it was an independent congregation. In the summer of 1926, it became known for the first time, on the hearing for preliminary injunction, that such claims were being made. There is no evidence to support such claims. Even the witnesses for this group admit on the witness stand that there was no quarrel over religion between them and the bishop, but they did oppose Father Werchowsky because, as they put it, he was trying to give their church to the bishop. And they make it plain that by this they mean that he was trying to take away the church property from the corporation.

For example, witness Basil Kozak, for the Autokafalic group, testified that there had always been trouble between the people and the priests from the beginning, in Father Struminsky's time. Being pressed on cross-examination what this "trouble" was and whether it was about the religion of the parish, the witness replied that it was about the priest signing the property over to the bishop; and the witness further answered that there was no trouble about religion. At this point, counsel for the Autokafalic group arose to interrupt and advise the court that the dispute concerned "rights of property" and that the chief contention was in respect to such rights and not in respect to religious matters.

We are convinced from a consideration of the evidence that this is so. That there was some dissension between the people, or some of them, and some of the priests from time to time, cannot be denied, but it is clear from the testimony of witnesses on both sides that such dissension as existed was over the property of the parish and not over their religion or the spiritual authority of the bishop. These differences, according to the testimony of the Autokafalic witnesses, appear to have arisen first when Bishop Ortynski took title to the church property on West School street in his own name from the trustees Mostecki and Halas, and later when certain efforts were made to subject the temporal

affairs of the church to a greater amount of control of the bishop by the attempted adoption of certain by-laws.

These differences, if they were really serious and fully shared by a majority of the congregation, do not appear to have come to a head or to have been acted upon by such majority until after the arrival of Father Werchowsky, in 1925. Soon after his arrival in Woonsocket, Father Werchowsky apparently took steps to put into effect some of the objectionable provisions of the disputed by-laws, which the Autokafalic group claimed the corporation had never adopted. Whether before that time such provisions were really objectionable to and were deemed illegal by a majority, which is denied by the Uniats, we need not now inquire.

In any event, such dissatisfaction as there was with Father Werchowsky, on the part of some members, grew when it became known in the winter of 1926 that he had caused to be introduced in the general assembly session of that year a bill identified as H. 1040. This bill, in brief, authorized the trustees or a majority of them, of any Ukrainian Greek Catholic Church, to transfer the property of such corporation to a corporation of five members, consisting of the bishop of such church, the chancellor, and the pastor, as members ex-officio, and two lay trustees of the parish selected by the three ex-officio members. With the knowledge of the introduction of this bill, opposition to Father Werchowsky became more violent, if not more widespread, among the congregation, and the fact that he was not an Ukrainian but a Russian did not help matters. The result was that open acts of violence were committed against him, and when Bishop Bohachewsky refused to remove him, the opposition brought suit in the earlier case, Equity No. 1324, in which they obtained the preliminary injunction against the bishop and the pastor, referred to at the outset of this opinion.

It is our belief that this present litigation can be traced to the introduction of the above-mentioned bill in the general assembly, more than to anything else. The fears ex-

pressed on the witness stand by several of the witnesses for the Autokafalic group that Father Werchowsky was going to give away their church property to the bishop were clearly founded on this proposed legislation. This bill was passed and was approved by the governor on April 27, 1926. Although no attempt had been made to get the trustees of said St. Michael's to exercise the authority which the act conferred upon them and no attempt was made by the trustees, themselves, to do so, there was apparently grave fear entertained by a substantial number of the congregation that such action would be taken if Father Werchowsky remained.

The management of the temporal affairs of this church appears always to have been vested in five trustees elected by members of the parish corporation. It appears also that among these trustees was the bishop or some person appointed by him through the pastor. In the later years just preceding this litigation Bishop Bohachewsky was one of these trustees. This method of choosing trustees was radically different from that authorized by the above act.

The corporation continuously followed this method of electing the trustees since the corporation was adopted in 1910. The Uniats contended that that method was set out in certain by-laws adopted in that year at the organization meeting of the corporation. They offered a copy of these alleged by-laws in evidence but they were not authenticated and they were not recorded in the minutes of that meeting, at which they were alleged to have been adopted. A great deal of testimony was taken on the question as to whether these alleged by-laws had ever been legally adopted. The trial justice has found that this set of by-laws was not adopted. While the testimony on this point, in our opinion, is not clear that they were not adopted, it is likewise not clear that they were, and therefore we cannot say from the evidence that the finding of the trial justice is clearly wrong.

The second set of by-laws, substantially similar to the first, was alleged by the Uniats to have been passed at a

meeting of the corporation held on June 3, 1923, for the reason that at that time the original by-laws were missing. The trial justice found that this set of by-laws also was never adopted by the corporation. Again, this finding must stand, as we are not convinced from our reading of the transcript that it is clearly wrong.

We are of the opinion, however, that by-laws of some kind must have been adopted, and the evidence of some of those regulations can be seen in the conduct and usage of this corporation from its organization. Annual meetings were held for sixteen years, at which meetings trustees were elected. The testimony shows that these were always five in number, and one of them was either the bishop or one member of the parish selected by him. Title was taken to real estate in the name of the corporation and title was transferred in the same way, with the approval of the bishop. Notice of meetings was always given by the priest in the church. Trustees elected from their number the officers of the corporation, consisting of a president, vice-president, secretary and treasurer. It is unlikely, to say the least, that these things were done casually without reference to some plan or system previously devised and adopted. We do not find, however, that the corporation recognized that the bishop had the right to control the temporal affairs of the church, other than the right to approve or disapprove any action alienating or incumbering the church property.

The evidence shows that this latter right was acknowledged by the parish on several occasions. When the property on West School street was purchased for a church and rectory, the bishop's approval was sought. When one of the trustees who held the legal title of this property returned to Galicia, the legal title was put into the name of Bishop Ortynski. When proceedings were brought after the bishop's death to get the legal title into the corporation, the Reverend Peter Poniatishin, the administrator, or acting bishop, joined with the trustees in those proceedings.

When this property was later sold, the acting bishop approved the sale.

When the property on Blackstone street was purchased with the proceeds of the sale of the West School street property and with funds obtained by solicitation especially for this purpose, with the acting bishop's approval, he was consulted and the title to this new property was taken in the name of the corporation with his approval. When this new property was mortgaged for the purpose of obtaining funds to build a new church thereon, the acting bishop approved and signed the mortgage. There is no denial on the part of the Autokafalic group that all these things were done, although they now deny that the corporation was in any way bound thereby. Moreover, no evidence was presented by that group that the corporation ever opposed or repudiated such acts, in spite of the fact that some of their witnesses testified that there was dissatisfaction among the parishioners over the participation of the bishop in these matters. On the whole, we are of the opinion that the great weight of the evidence clearly shows that the corporation, and the members of the church generally, accepted this participation by the bishop as proper. The findings of the trial justice to a contrary effect are therefore clearly erroneous.

By force of custom and usage as to these matters it becomes doubly clear that said St. Michael's Church, as a corporation, continued to acknowledge, as it did while a voluntary society, that it was a part of the general church body of the Greek Catholic Church in the Ruthenian Rite in union with Rome and that its property was dedicated to the teaching and practice of the doctrines, rites and discipline of that church. From this it follows that St. Michael's Church is of the third class of religious congregations referred to in *Watson* v. *Jones, supra,* and therefore no majority of the congregation, however large, could alter the uses to which its property was first dedicated.

As long as the corporation of St. Michael's Ukrainian Greek Catholic Church of Woonsocket put no obstacle in the way of the use and maintenance of the property of this church for the teaching and practice of the doctrines, rites and discipline of the Greek Catholic Church in the Ruthenian Rite in union with Rome, its duly elected trustees were entitled to manage and control said church property and the corporation was entitled to hold the legal title of said property in trust for such use. But when it was attempted to divert this property from its dedicated uses and when the faithful adherents of the ancient form of worship were prevented from worshiping as they always had in this church and from participating in corporate meetings, the majority of the corporation and the trustees were acting illegally. The law is clear, and we find, that such a corporation cannot devote such property to a different use, even though a majority vote to do so. *Lindstrom* v. *Tell,* 131 Minn. 203. See also *St. John the Baptist Church* v. *Gengor,* 118 N. J. Eq. 467, 180 A. 379, affirmed, in part, in 189 A. 113, and cases cited in 118 N. J. Eq. 467. And if the members of such corporation attempt to take over such church property to another and different religious faith, and the trustees join in such action, the law will return the church property to those members who still retain the ancient faith, even though they be but a small minority of the church; and the trustees who permitted or joined in the diversion will be held to have renounced their offices. *The True Reformed Church* v. *Iserman,* 64 N. J. L. 506; *Schilstra* v. *Van den Heuvel,* 82 N. J. Eq. 155; *Grupe* v. *Rudisill,* 136 A. 911, (N. J.).

Who then are the present trustees of St. Michael's Ukrainian Greek Catholic Church of Woonsocket? The trustees of this corporation on July 14, 1926, with the exception of Bishop Bohachewsky, permitted the property of this church to be diverted from the uses to which it was dedicated. On that date a majority of the corporation voted to resist the

claims of the Greek Catholic Church in union with Rome, and later in August and September of 1928 they took further action to prevent that church from enjoying the use and benefit of said property by transferring it to the Autokafalic Orthodox Church. Thereafter the trustees and the majority of the members of the corporation of St. Michael's Ukrainian Greek Catholic Church of Woonsocket abandoned that corporation by permitting its charter to lapse and by organizing a new corporation, St. Michael's Ukrainian Orthodox Church of Woonsocket, Rhode Island, of which they then became members, taking with them the property of the old corporation.

The Uniats continued to claim membership in the old corporation but had been excluded from the corporate meeting of July 14, 1926, and from subsequent meetings, because they would not state that they were against the bishop. Upon learning of the forfeiture of the charter of the old corporation, the Uniat minority revived the corporation charter by taking the necessary action prescribed by statute for that purpose.

The Autokafalic group contends that this action of the Uniat minority was without authority and void. On the contrary, we are of the opinion that the Autokafalic group has no standing here to complain of this action. Having renounced the faith of the original St. Michael's Church and permitted the corporation to cease to exist, it does not lie in their mouths to question the action of those who, remaining loyal to the original faith, took seasonable steps to preserve the corporate charter of the church of that faith. Indeed, there is some question whether, having permitted the charter of St. Michael's Ukrainian Greek Catholic Church of Woonsocket to lapse, while Equity No. 1324, in which it was complainant against Bishop Bohachewsky et al., was pending in the superior court, they had any further standing in that court. However, on our view of the cases before us, it is not necessary to pass on this point.

We find that the meeting of July 14, 1926, and all subsequent meetings, from which the minority were thus illegally excluded, are invalid. The acts of such meetings affecting the rights of the Greek Catholic Church in union with Rome to the property of St. Michael's Ukrainian Greek Catholic Church, and affecting also the rights of Bishop Bohachewsky, are a nullity. We further find that the trustees of the church, who joined the Autokafalic Church and joined in the attempt to transfer this church property to that church, renounced thereby their offices as trustees of St. Michael's Ukrainian Greek Catholic Church; that those members of the old corporation who organized and joined the new corporation forfeited their membership in the former. It may be added that, of course, the acts of said meetings were without legal force and effect to validly transfer to the new corporation, St. Michael's Ukrainian Orthodox Church of Woonsocket, Rhode Island, the real and personal property of the old corporation, St. Michael's Ukrainian Greek Catholic Church of Woonsocket.

We find also that the action taken at the meeting of July 14, 1926, with reference to amending the articles of association of said St. Michael's Ukrainian Greek Catholic Church, which amendment was filed at the office of the secretary of state on July 17, 1926, is invalid. Since, however, it has also been found by the trial justice and not reversed here, that neither of the two sets of by-laws, alleged and claimed by the Uniats to have been regularly passed, was legally adopted, the amendments to said articles of association, wherein a part of said second set of by-laws was incorporated therein, filed at the office of the secretary of state on February 16, 1924, are also invalid and of no force and effect.

The effect of these findings is to restore the old corporation to its status at the time the present litigation was commenced in 1926, with no particular set of written by-laws and no amendments of any kind to its original articles of association on file in the office of the secretary of state, ex-

cept that amendment which substituted the word "Ukrainian" for the word "Ruthenian" in its corporate name. Amendments to these articles which were made by the Uniats since the revival of the charter and while the present litigation was pending cannot be approved as valid. An opportunity must be given to all who are eligible to participate in the conduct of the affairs of this corporation at the conclusion of this litigation before any action can be validly taken to alter the status of the corporation as it existed at the commencement of the litigation.

The Autokafalic group contends that, in any event, these Uniats should not prevail, as they have been guilty of laches in the earlier case, Equity No. 1324, in not pressing it to a final determination until January 1935, almost eight years after the decision of this court on the preliminary injunction on April 13, 1927. The trial justice so found. We are of the opinion that such finding is erroneous. The complainant cites no case in this state which places the burden solely on the respondents to bring complainant's bill to a hearing on the merits. If there was any obligation on either party to press for a hearing on the merits, it was on the complainant as much as on the respondents, if not more so. Decision on the prayer for preliminary injunction in favor of the complainant did not decide the merits and did not authorize it to deal with the property in dispute as though such property had been finally awarded to it.

Under the circumstances of the earlier case, Equity No. 1324, whether or not such burden may be placed on the respondents, no good cause exists for so holding in this instance.

The Autokafalic group contends, nevertheless, that if this property is restored to the Uniats it will constitute unjust enrichment, unless the Uniats are required to reimburse them for the funds which they have expended on the property since the decision on the preliminary injunction. The Uniats contend, on the other hand, that the Autokafalic

group are not entitled to reimbursement, because that group has had the exclusive use and benefit of the property during that period, while the Uniats were deprived of such use and were forced at their own expense to obtain suitable accommodations for their pastor and their congregation elsewhere. And they argue further that, if the Autokafalics are held to be entitled to such reimbursement, the fair rental value of the church and the parish house should be set off against such expenditures and that they will be found to amply offset the same. Evidence of such fair rental value was offered by both sides.

Assuming that this contention of the Autokafalic group is entitled to consideration, we find that the evidence clearly fails to show that the Uniats will be unjustly enriched. The great weight of the evidence supports the contention of the Uniats that the fair rental value of the property substantially equals the expenditures which were made by the occupants of the property while they were enjoying possession. We are, therefore, of the opinion that the finding of the trial justice that the Autokafalic group have suffered an irremediable loss is clearly wrong.

The Autokafalic group makes a final contention that this matter is *res adjudicata* by reason of the decision of the supreme court of Massachusetts in *St. Michael's Ukrainian Greek Catholic Church* v. *St. Michael's Ukrainian Orthodox Church*, 288 Mass. 258, 192 N. E. 628. There is no merit in this contention. This case involved the title to the parish cemetery, situated in Massachusetts, and was decided according to the law governing religious societies peculiar to Massachusetts, under an express provision of its constitution. The parties before the court were not the same and the subject-matter was also different. The controversy in that case was ownership of land in Massachusetts, and that only. In so far as that issue is concerned, it is, of course, *res adjudicata* and we cannot now deal with it.

There is evidence in these cases from which it could be reasonably found that there are now and have been a number, and probably a large number, among the Autokafalic group who never really intended to leave the Uniat Greek Catholic Church but only objected to the control of the temporal affairs of the church being transferred from the corporation to trustees appointed by the bishop without the consent of a majority vote of the corporation. Indeed, counsel for the Uniats express this view in their brief and in the concluding paragraph thereof say: "A reversal of the decrees entered in the court below will not force these people to evacuate this church. On the contrary, they will remain and with the exception, perhaps, of a few turbulent leaders, will be reincorporated and reinvested in the old faith with justice and harmony reestablished." In view of these unusual circumstances, equity will be best accomplished if an opportunity is afforded any such misguided members of this church to return thereto and resume their former status as members of the church and of the corporation of St. Michael's Ukrainian Greek Catholic Church of Woonsocket.

Accordingly, all persons who were such members on July 14, 1926 but who thereafter joined the Autokafalic Church will be given the privilege, if they so desire, to profess in writing their adherence to the Greek Catholic Church in the Ruthenian Rite in union with Rome and thereupon be listed as members of the corporation. Thereafter, those persons who have been thus restored to membership and all other persons who remained members of the church and the corporation and also those who became members since July 14, 1926, shall constitute the roll of the corporation's members for the purpose of the meeting of the corporation hereafter ordered to be held.

For the purpose of restoring the organization of the corporation of St. Michael's Ukrainian Greek Catholic Church of Woonsocket in accordance with this opinion, the superior

court is directed to appoint a special or standing master in chancery who shall call and conduct a meeting of said corporation for the purpose of filling the vacancies in the offices of trustees caused by the renunciation of their offices by such trustees who, on and after July 14, 1926, concurred in the transfer of the property of this corporation to the St. Michael's Ukrainian Orthodox Church of Woonsocket, Rhode Island. Said master in chancery shall also make up a proper roll of the members of this corporation in accordance with this opinion. In the performance of his duties he should be authorized to obtain the services of some person or persons conversant with the Ukrainian language. From and after the date of the decree to be entered herein, Father Basil Tremba, the present pastor of St. Michael's Ukrainian Greek Catholic Church, or his successor duly appointed by the Uniat bishop, shall be entitled to conduct religious exercises in the church on Blackstone street and to occupy the parish house. Within a reasonable time to be fixed by this court in the decree, the parish house shall be surrendered by the present occupant thereof to the proper person entitled to occupy the same. Possession of the church shall be given forthwith upon entry of the decree. All personal property belonging to the church and described in the bill of sale to St. Michael's Ukrainian Orthodox Church, dated June 31, 1929, shall be turned over to the trustees, as reconstituted, to have and use for the benefit of St. Michael's Ukrainian Greek Catholic Church. The deed of real estate to St. Michael's Ukrainian Orthodox Church of Woonsocket, Rhode Island, shall be delivered up and canceled, and such cancelation shall be made to appear in the land records of the city of Woonsocket, in the office of the city clerk, where said deed now appears of record.

The appeals herein are sustained, and the decrees appealed from are reversed. The parties may, on January 28, 1938, appear before this court and present forms of decrees

for entry in the superior court, in accordance with this opinion.

*Walling & Walling, Everett L. Walling, Lester S. Walling, Ambrose W. Carroll,* for St. Michael's Ukrainian Greek Catholic Church, &c.

*Ambrose Kennedy, James T. Greene,* for Constantine Bohachewsky et al.