## MAURICE F. McAULIFFE, BISHOP OF HARTFORD, ET ALS.

*vs.*

## THE RUSSIAN GREEK CATHOLIC CHURCH OF ST. JOHN THE BAPTIST ET ALS.

Superior Court      Fairfield County      File No. 56887

MEMORANDUM FILED SEPTEMBER 11, 1941.

*Shannon & Wilder,* of Bridgeport, for the Plaintiff.

*Reich & Reich,* of Bridgeport, for the Defendant.

INGLIS, J.- In this action both the plaintiffs and the de-

fendants pray an adjudication as to who has the legal title to two pieces of real estate located in Bridgeport, one fronting on Arctic Street, upon which stands a church and rectory, and the other fronting on Pembroke Street, upon which stands a so-called school; and a further adjudication as to the uses and purposes for which title to said property is held. Each side also prays various forms of coercive relief designed to carry into effect the adjudication relative to the title and use of the property.

The ultimate claim of the plaintiffs is that the legal title to the property is in a corporation known as The St. John Baptist Church and that it is held for the uses of the Roman Catholic Church, Greek Ruthenian Rite, whereas the claim of the defendants is that the legal title is in a corporation known as The Russian Greek Catholic Church Of Saint John The Baptist and that the title is held for the uses of a church known formerly as The Greek Catholic Church of St. John the Baptist of Bridgeport, Connecticut, which they claim was and is an independent autonomous church.

The history of the legal title to the property is as follows:

On May 16, 1904, Stephen Meaney by warranty deed conveyed the Arctic Street property to Joseph Kochiss, Joseph Adzima and Alexius Dudinski, "Trustees for St. John's Greek Baptist Society," with an *habendum* to "their successors and assigns forever, to them and their own proper use and behoof."

On January 29, 1906, Joseph Kochiss and Joseph Adzima, "Trustees for St. John's Greek Baptist Society," quit-claimed that property to The St. John Baptist Church, a corporation, and, on the same date, Alexius Dudinski, "trustee for St. John's Greek Baptist Society", by another deed likewise quit-claimed the property to the same corporation.

Title to the so-called school property on Pembroke Street was conveyed in various pieces to the corporation, The St. John Baptist Church, by six deeds. These deeds are: a warranty deed from William H. Keating and Walter T. Keating, dated May 27, 1920; an administrator's deed from Julia E. Keating, administratrix, dated July 14, 1920; a warranty deed from Julia E. Keating, dated July 14, 1920; a guardian's deed from Julia E. Keating, guardian, dated July 14, 1920; a warranty deed from Andrew N. Pyrch, dated September 8, 1924; and a quit-claim deed from John Marcinin, dated October 8, 1924.

On February 17, 1932, two quit-claim deeds were executed by Rev. Orestes P. Chomock, Michael Puskar and Andrew Sura, purporting to act as the duly authorized trustees and agents of "The Saint John Baptist Church", the ecclesiastical corporation, by which deeds it was attempted to convey the title to both pieces of real estate to John Popp, Joseph M. Adzima, John Kimak, Simon Jasenzak, Michael Hriczko, Joseph Dudrick, Andrew M. Patrick, Stephen Habansky and John Onofrey, "as trustees for the parishioners and the congregation of the St. John The Baptist Greek Catholic Church of Bridgeport."

On May 3, 1933, said John Popp et al., as such trustees, by two deeds quit-claimed the property to The Russian Greek Catholic Church Of Saint John The Baptist Of Bridgeport, Connecticut, Incorporated.

On January 2, 1935, said The Russian Greek Catholic Church Of Saint John The Baptist Of Bridgeport, Connecticut, Incorporated, mortgaged the church and rectory property on Arctic Street to The Saint Basil Society Of Saint John The Baptist Greek Catholic Church, Incorporated Of Bridgeport, Connecticut, to secure a note for $15,000.

The corporation known as The St. John Baptist Church was incorporated on December 5, 1905, when Michael Tierney, Bishop of Hartford, John Synnott, Vicar-General, Rev. Elias Gojdics, pastor, and Michael Bobko and George Bestercy, laymen, signed a certificate of organization certifying that they had organized a corporation under the provisions of the statute laws of Connecticut governing the organization of Roman Catholic churches.

Parenthetically it may be here noted that the defendants contest the validity of that incorporation. Briefly, their claim is that Michael Bobko was induced to sign the certificate on a claimed fraudulent representation by Fr. Gojdics as to the purport of the certificate, and that said Bobko did not know nor understand what he was signing. It is probably true that Bobko did not fully understand what a corporation was and what all of the attributes of a corporation were. The evidence, however, does not justify a finding that there was any misrepresentation, fraudulent or otherwise, on the part of Fr. Gojdics, nor a finding that Bobko did not know that what he was doing was signing a certificate of organization for a corporation connected with the Greek Catholic Church

of St. John the Baptist of which he was then a member and trustee. He knew that he was signing a document which would form such a corporation, and that is sufficient knowledge to make his act binding upon him. The incorporation, accordingly, was effectively accomplished. Moreover this corporation undertook to act as a corporation, and there had been a *bona fide* attempt to organize under the valid authority of the statute. It was, therefore, at least a *de facto* corporation, and, as such, its valid existence as a corporation may not be attacked collaterally as it is in these proceedings. It might be attacked only in an action by the State to annul the organization and, in particular, a grantor of land to a *de facto* corporation cannot deny the legality of his grant (which is the purpose of the defendants here) on the ground that the corporation was not duly incorporated. 2 *Cook, Corporations*, (6th ed. 1908) §637, 1811. It follows that, for the purposes of this case at least, The St. John Baptist Church is a validly organized corporation.

Said corporation was organized under general statutes which are now sections 3574-3576 of the General Statutes, Revision of 1930. These sections provide that a corporation may be organized "in connection with any Roman Catholic church or congregation", and, when organized, its members shall be the bishop and the vicar-general of the diocese of Hartford and the pastor of the church, *ex officio,* and two laymen to be appointed annually by the *ex officio* members. "Such corporation may receive and hold all property conveyed to it for the purpose of maintaining religious worship according to the doctrine, discipline and ritual of the Roman Catholic Church." It is further provided that "such corporation shall at all times be subject to the general laws and discipline of the Roman Catholic Church."

The laws and discipline of the Roman Catholic Church for the Diocese of Hartford contain a set of by-laws which, without being formally adopted by each corporation, do, by virtue of the statute, actually govern each corporation organized under the Act. These by-laws govern The St. John Baptist Church. Paragraph 4 thereof provides: "At any regular meeting of the Board, a majority of the Trustees, one of them being a layman, shall constitute a quorum for the transaction of business. In all matters relating to the sale or mortgage of the property of the Church, or to the incurring of any in-

debtedness on the part of the Church exceeding the sum of Five Hundred Dollars, acts of such a quorum, in order to be valid, must be confirmed by the written approbation of the Bishop or of the Administrator of the Diocese."

It does not appear that there was ever any meeting of the board of trustees or members (who are the trustees) of The St. John Baptist Church which by vote authorized the transfer of the property which was purported to be made to John Popp, et al., trustees, by quit-claim deeds dated February 17, 1932. Accordingly, even though the three men who signed those deeds were a majority of the then trustees of the corporation, their execution of the deeds was without authority. Moreover there was no approbation, written or verbal, of those conveyances by the then bishop of the diocese. For this reason also, the deeds, clearly, were ineffective to convey any title to the releasees named in the deeds. From that it follows that the legal title to both properties in question is still in The St. John Baptist Church, that The Russian Greek Catholic Church Of Saint John The Baptist of Bridgeport, Connecticut, Incorporated, never took the legal title, and that the mortgage to the Saint Basil Society was a nullity so far as any conveyance of title to the real estate is concerned.

In this case it is necessary to keep clearly in mind the distinction between the corporation known as The St. John Baptist Church and the voluntary organization known formerly as The Greek Catholic Church of St. John the Baptist. Ordinarily a Roman Catholic church corporation organized under Connecticut statutes is the local church. It not only holds the title to all of the property, real and personal, of the church but it transacts all of the business of the church. That, however, has not been true of The St. John Baptist Church. That corporation has never done any business for the church except execute mortgages of the real estate. As a matter of fact, lay trustees have been appointed pursuant to the statute only in 1906, 1907, 1912, 1913 and 1914. The trustees have never met as such except on September 29, 1906, to authorize a mortgage of the real estate to The Mechanics and Farmers Savings Bank.

There has also been in existence since September 2, 1900, a voluntary association known originally as The Greek Catholic Society of St. Elias the Prophet, which on May 8, 1904, changed its name to The Greek Catholic Church of St. John

the Baptist. It is this association which has transacted all of the business of the church except that relating to the acquisition of some of the real estate and the mortgaging thereof. The membership of this association constitutes the membership of the church. All of the receipts of the parish except the proceeds of various mortgages came first into the treasury of this association and were expended from that treasury. All of the secular affairs of the parish were managed pursuant to votes of this voluntary association.

The corporation The St. John Baptist Church was organized practically exclusively by the efforts of Fr. Gojdics, who was the priest who had been engaged by The Greek Catholic Church of St. John the Baptist. He himself prepared the certificate of organization and procured the signatures thereto. Although he told a meeting of the parishioners that he was chartering a corporation and that the purpose in doing so was to provide an entity to hold the title to the real estate of the parish under the "Hartford Bishop", the voluntary association never voted to incorporate itself. Indeed the concept of a corporation was outside of the experience and knowledge of most of the members of the parish. It therefore is clear that the voluntary association never was merged in the corporation. *First Russian National Organization vs. Zuraw,* 89 Conn. 616. The two, the voluntary association and the corporation, have continued to exist side by side.

As appears above, the title to the church and the rectory property on Arctic Street was first held by Joseph Kochiss, Joseph Adzima and Alexius Dudinski as trustees for the voluntary association. They held the bare legal title in trust for the use of the church. They could convey no more than they had. Accordingly, all that the corporation The St. John Baptist Church took from them was the bare legal title to hold it in trust for the uses and purposes of the voluntary association which was the church.

More than that, the real estate had been purchased by funds which had been raised by and belonged to the voluntary association for the establishment of a Greek Catholic church. It was not the intent of the voluntary association to vest either in the individual trustees nor in the corporation any interest beneficial to them personally or to the corporation as such. Accordingly, even though there had been no express trust,

equity would set up a resulting trust. *Restatement, Trusts,* §440.

The same thing is true as regards all of the other property title to which has come into The St. John Baptist Church corporation, *i.e.,* the church and rectory built on the Arctic Street property, the Pembroke Street property and the school built thereon. These have all been paid for (over and above the mortgages) by funds which belonged to The Greek Catholic Church of St. John the Baptist, the voluntary association; funds raised by that association for the purpose of maintaining religious worship in accordance with the rite to which the association belonged. It was never the intention of the donors of these funds nor of the voluntary association to vest in the corporation, as such, any beneficial interest in the property. It therefore follows that the title is held by the corporation under a resulting trust for religious purposes, and those religious purposes are the ones for which the voluntary association existed at the time the trust was created.

It is of course true that under the statute The St. John Baptist Church is empowered to hold property only for the purpose of maintaining religious worship, according to the doctrine, discipline and ritual of the Roman Catholic Church, which includes both the Latin Rite and the Greek Ruthenian Rite.° It has no power to hold property for an independent autonomous church. This however does not affect the conclusion that The St. John Baptist Church holds the property for the purposes of the church maintained by the voluntary association as they were at the time title became vested in the corporation, no matter of what denomination that might be. Equity will not permit a charitable or religious trust to fail for lack of a trustee. If, therefore, it should be found in this case that The Greek Catholic Church of St. John the Baptist were an independent autonomous church, equity would simply appoint another trustee. It would not let the trust fail.

When a trust is once established for any particular religious or charitable use it remains for that use forever and to no other use whatever. (Gen. Stat. [1930] §5000.) Accordingly, the rule is well recognized that the title to church property of a divided congregation is in that part of it which is acting in harmony with its own law, and the ecclesiastical laws, usages, customs and principles which were accepted among

them before the dispute began. *Russian Orthodox Greek Catholic All Saints Church vs. Kedrovsky,* 113 Conn. 696, 704. The opinion of Lord Eldon in *Attorney General vs. Pearson,* 3 Merivale 400, is often quoted to the effect that it is the duty of the court to decide in favor of those, whether a minority or majority of the congregation, who are adhering to the doctrine professed by the congregation and the form of worship in practice, as also in favor of the government of the church in operation with which it was connected at the time the trust was declared. *Greek Catholic Church vs. Orthodox Greek Church,* 195 Pa. 425, 433, 46 Atl. 72, 75; *St. Michael's Ukrainian Greek Catholic Church vs. Bohachewsky,* 60 R.I. 1, 196 Atl. 796.

The ultimate question in this case, therefore, is as to what sort of a church The Greek Catholic Church of St. John the Baptist was from 1906 to 1920, and what were the doctrines professed by the congregation, the forms of worship, the form of governance and the religious adherence connection, if any, of that organization. Was that voluntary association a Roman Catholic Church of the Greek Ruthenian Rite, as claimed by the plaintiffs, or was it an independent autonomous Greek Catholic church, as claimed by the defendants?

This much is clear, that whichever it was the bare legal title is now held by The St. John Baptist Church for the uses and purposes of The Greek Catholic Church of St. John the Baptist as those uses and purposes were in 1906 and 1920, and the property must continue to be used for those same uses and purposes, irrespective of who holds the legal title. It is therefore necessary to determine what those religious purposes were. Were they those of a Roman Catholic Church, Greek Ruthenian Rite, or were they those of an independent congregationally governed Greek Catholic Church? And all that depends upon the question of what was the intention of the voluntary association which was the church as to the kind of a church they were maintaining.

As bearing on this question, the fact that the church was referred to as a Greek Catholic church does not, in itself at least, outside of the history of this particular church, have very much significance. The term Greek Catholic may mean either a member of an Eastern Orthodox Church, or a member of a Greek Catholic Church united with Rome, who in this country are commonly referred to as Roman Catholics

of the Greek Ruthenian Rite; or it may mean, at least in America and in more recent years, a member of an independent autonomous or autocephalous church which uses the liturgy of either the Eastern Orthodox Church or the Greek Catholic Church united with Rome.

There are, however, three different sorts of evidence which have a bearing on the question to be decided. They are, first, the evidence as to the historical and religious background and affiliations of the people who organized the church in question; second, the purposes they expressed in their articles of association as those are to be interpreted in the light of their background; and, third, the evidence of the acts of the group from the time of their organization down to the times of the creation of the trust and indeed afterwards. The evidence on these various subjects will be discussed in order.

The persons who made up the group which organized itself as the Greek Catholic Society of St. Elias the Prophet were almost, if not altogether, exclusively people who had immigrated in the 1890's from territory known as Podkarpatska Rus. This territory lay on the south slopes of the Carpathian Mountains and was then a part of Hungary. The people themselves, together with those who lived on the north and east of the Carpathians in Galicia and Ukrainia, were known as Russians or Little Russians, or, in this country, as Ruthenians or Carpatho Russians. They were Slavs and spoke a dialect of the Russian language.

Their forbears in Podkarpatska Rus had been converted to Christianity about 865 A.D. by Sts. Cyril and Methodius, who were missionaries who were sent out originally by Photius, the Patriarch of Constantinople. The Old Slavonic language which these missionaries found the people talking had no written characters, so they used the Greek alphabet plus some additional characters to represent the sounds in the Slavonic, and thereby made the Old Slavonic into a written language. Into that language they translated the liturgy and sacraments of the Eastern Church. Accordingly, the forms of worship in the church of Podkarpatska Rus have always been those of the Eastern Orthodox Church and in the Old Slavonic language.

Before Sts. Cyril and Methodius had reached the Russins, Photius had had a disagreement with the then reigning Pope. In this disagreement Sts. Cyril and Methodius aligned them-

selves with the Pope, so that, upon their conversion, technically at least, these people came under the jurisdiction of the Pope. During the century after the deaths of Sts. Cyril and Methodius, however, the priests and people in this territory became out of touch with Rome and gradually became more closely aligned with Constantinople, so that, by the time of the Great Schism in 1054, they were completely under the dominance of Constantinople and followed the Patriarch of Constantinople, completely Eastern Orthodox.

For several centuries after the Great Schism missionaries from Rome were engaged in attempting to win over to allegiance with Rome various groups from the Eastern Orthodox Church. During that period the Russins were within the territory of the Holy Roman Empire and within that territory there was persecution of the Eastern Orthodox. In particular, the Eastern Orthodox priests were treated as serfs and had none of the civil rights and privileges of the Roman Catholic clergy.

As a result of these conditions the Eastern Orthodox bishops and clergy located in Galicia and most of Ukrainia in 1595 entered into an agreement with Rome known as the pact of Brest-Litovsk. By the terms of that pact it was agreed that those priests and bishops acknowledged their allegiance to the Pope and to the Roman Catholic Church, with, however, certain reservations, among which was that they might preserve their ancient rites.

Apparently following this pact as a precedent, in April, 1649, 63 priests from the territory of Podkarpatska Rus met in the citadel at Ungvar and framed a petition to Rome whereby they declared that they had renounced the "schism of Grecian insanity" and returned to the Holy Roman Church, and that they professed "the most Holy Innocent X as the Universal Pastor of the Church of Christ and our Pastor", and desired to "depend from him in all", however with these conditions added: "First, that it be permitted us to retain our Rite; Second, to have the Bishop elected by us and confirmed by the Apostolic See; Third, to freely enjoy ecclesiastical liberties." They also recited that they had chosen their own bishop, one Peter Partheny, and that all of that had been approved by the Roman Catholic Bishop of Eger and the then Primate of Hungary, and prayed the Pope for "the protection of our cause, and confirmation of the Bishop elected by us."

It appears that Rome never definitely accepted this proposal nor bound itself to respect the reservations. However, Bishop Partheny and his priests and their successors continued to hold themselves in allegiance to Rome, and under the primates of Hungary and the bishops of Eger, carried on as though the petition had been approved by Rome. The 63 priests continued to add to their number until finally they had with them practically all of the priests in Podkarpatska Rus. These priests continued to elect their own bishops until 1771. In that year Rome set up the Diocese of Munkacs, covering most of the territory, and, from that time on, appointed bishops for that diocese upon nomination by the Hungarian crown. Again, in 1810, Rome set up the diocese of Presov, covering all of the rest of the territory, and, after that, appointed bishops for that diocese in the same manner.

All during this period and down to nearly the end of the 19th century, at least, the Hungarian government did not recognize the Eastern Orthodox Church. By law the term "Greek Catholic" meant those Greek Catholics who were united with Rome. In the latter part of the 19th century the population of Podkarpatska Rus was almost exclusively Greek Catholics united with Rome. There never has been in Podkarpatska Rus any such thing as an independent or autonomous Greek Catholic Church.

The people of Podkarpatska Rus were, for the most part, peasants. They were a simple folk but they were pious and deeply religious. They loved their Greek Catholic Church and they knew the traditional history of it. The union with Rome had started as a purely clerical affair and, actually, it had continued largely as such. To the people, as distinguished from the clergy, the union seemed tenuous. At least it was not a prominent part of their faith. Indeed, as a result of Rome's taking over the appointing of the bishops some resentment against Rome had been engendered. There was at least some fear that Rome would try to make them conform in various ways to the Latin or Western Rite of the Church. But they knew that their church was affiliated with Rome. They knew that the Pope of Rome was the head of their church. And they were content to have it so, so long as they were permitted to worship in the manner of the Greek Catholic liturgy and sacraments.

It is from this background that the early members of the

Elias Society came. Many of their compatriots had emigrated to America during the 1870's and 1880's. These had settled largely in Pennsylvania and New Jersey. Very shortly after settlements were made they had organized churches and sent back to the old country for priests. And these priests had been sent over mostly by the Bishop of Munkacs or the Bishop of Presov with faculties from those bishops to act as pastors in specified communities. Apparently also, some priests had come on their own initiative.

Greek Catholic priests are not celibate. They have the power to confirm children at baptism and that is the usual procedure. In these particulars and many others the Greek Catholic Church united with Rome differs materially from the Latin Rite of the Roman Catholic Church, the church which was established here before the advent of the Russins. Consequently misunderstanding arose and, as a result, in 1890, the Sacred Congregation for the Propagation of the Faith of the Roman Catholic Church decreed that thereafter no priest should come to America from the old country until after his bishop there should advise Rome and Rome should notify the local bishop in the diocese in America to which the priest was to come, and that no priest should be sent unless he be either unmarried or a widower without children. This latter provision looking to celibacy called forth a protest and was not enforced, but thereafter the Greek Catholic parishes in the United States were under the control of the local bishop of the Latin Rite.

So far as the evidence discloses there was no migration of Ruthenians into Bridgeport until after 1890. By 1900, however, a very considerable group had arrived. There probably were some Galicians and Ukrainians in the group but they were predominantly from Podkarpatska Rus. And, whether they came from Galicia, Ukrainia or Podkarpatska Rus, they were predominantly Greek Catholics united with Rome.

Of those who were the original founders of the St. Elias Society or became members before any land was purchased, evidence was given from which the prior religious connections of 20 may be determined. Of these, 16 were without question Greek Catholic Uniates or Roman Catholics. The remaining four had been members of the Russian Orthodox Church in the old country but, of them, three had married Roman Catho-

lics and had attended Roman Catholic churches before they joined the St. Elias Society, and the remaining one was not an original member of the society but started attending services with them at about the time the first property was bought. On the basis of these figures it is a fair inference that practically all of the 64 founders were Greek Catholics united with Rome and that the rest were either Roman Catholics or felt that they were because of their marriages and previous attendance at Roman Catholic churches.

It is also significant that many of the group had been attending The Holy Ghost Church on Hallett Street. This was actually an Eastern Orthodox Russian church located on the East Side of Bridgeport in the neighborhood where these people lived. The only Uniate church in Bridgeport at the time was the Holy Trinity Hungarian Church, and that was on the West Side several miles away. Apparently the group in question at first did not realize that the Hallett Street church was Eastern Orthodox, and, when they did realize it, they withdrew to found the St. Elias Society. They later brought suit to recover and did recover by way of settlement $250 of the money which they had contributed to the Hallett Street church. This is something of an indication that the early members of the St. Elias Society considered themselves Uniates, at least as distinguished from Eastern Orthodox.

So much for the religious background of the people who organized the voluntary association which is The Greek Catholic Church of St. John the Baptist. They were Ruthenians almost exclusively from Podkarpatska Rus and they were Greek Catholics united with Rome. From that it may well be inferred, unless there be substantial evidence to the contrary, that their intention was to form a church of that denomination to which they belonged. With that background it would be hardly possible that they intended to found an Eastern Orthodox church. It would not be probable that they intended to found an independent church because such a thing was unknown in their experience. It would be highly probable that they intended to form just such a church as that in which they had been brought up, a church which should be of the denomination to which they belonged. That would be a Greek Catholic Uniate Church, or, as they later came to be known in this country, a Roman Catholic Church of the Greek Ruthenian Rite.

The second class of evidence which aids in determining the

intention of the founders as to the character of the church they were founding is the records of the early meetings of The St. Elias Society.

The records of "The Greek Catholic Church Society of St. Elias the Prophet" show that it was founded on September 2, 1900. At that meeting officers were elected. At the second meeting, on September 23, 1900, it was decided that "Church paragraphs", meaning by-laws, should be set up. Such paragraphs were set up on September 29th by 12 members and were adopted "unanimously with 48 votes" on October 7, 1900.

The first paragraph obviously is intended to state the purposes of the society. It is as follows: "1A. This Society shall take care of its Greek Catholic Faith and its Greek Catholic Church, at Bridgeport, Connecticut. Each and every faithful Greek Catholic in whose heart lies his paternal and maternal Greek Catholic faith can become a member of this Society. This Society does not pay any kind of sick benefit to its members, but only for Church and whatever is necessary for the Church."

The second paragraph provides for annual dues and for the payment of ten cents by each person who attends church "i.e. for the pew." It then reads: "From this the salary of the priest is to be paid, and other church goods which are necessary for the Church, and whatever will remain goes to the Treasury, and that for the future, so that we may be able to have our own Greek Catholic Slavonic Church in Bridgeport, Connecticut."

The paragraphs go on to provide that, unless a member is paid up on his dues, he may not receive any of the sacraments, and that any member who "shall oppose these paragraphs and agitate the people" may be suspended from membership. They further provide as to how the funds shall be handled and paid out. They also fix the duties of the various officers, including a provision that the president shall open and close every meeting with prayer.

It is true that these paragraphs in several particulars provide for procedures which are not customary in a Roman Catholic church. For instance, in a Roman Catholic church there is no president, and whenever there is a meeting of the

members of the parish, which is rare, it is presided over by the priest and it is he who says the prayers. However, it should be remembered that at the time these paragraphs were adopted this church had no regularly settled priest and of necessity had to make different provisions for the conduct of its meetings. In a Roman Catholic church no member may be suspended by the membership. Discipline comes only from the clergy. Roman Catholic churches ordinarily have no dues and, particularly, no provision that the failure to pay dues shall exclude from the sacraments. But that is not universally true. The requirement that dues be paid and that, if they are not paid, the person in default shall not receive the sacraments is fairly common in the Greek Catholic Uniate churches of Podkarpatska Rus and, certainly, to these people, such a provision would not have seemed inappropriate in a Uniate church.

The really significant feature of the paragraphs is that the purpose of the society is to take care of its "Greek Catholic Faith and its Greek Catholic Church", that its members shall be those "in whose heart lies his paternal and maternal Greek Catholic faith." They purpose to save their money "so that we may be able to have our own Greek Catholic Slavonic Church." The words "our own" as translated in this last quotation are in the original minutes, the words *"sovju vlastnu."* It is urged by the defendants that in the Russian language the adjective *vlastnyi,* of which vlastnu is the feminine ablative, connotes "having power or control over", and from that they argue that its use in this connection indicates an intention to found a church over which the people themselves were to have full control. Although, in the high Russian, *vlastnu* might have that significance, nevertheless in the Ruthenian dialect it does not. In that dialect it is simply a very strong possessive. In this connection it means nothing more than a church which was to be very close and dear to the founders and the people.

The important thing is that it is perfectly plain that they are organizing a Greek Catholic church, a church dedicated to the Greek Catholic faith of their fathers and mothers. That, to those people, could mean but one thing. The Greek Catholic church and the Greek Catholic faith of their fathers and mothers meant the Greek Catholic Church united with Rome and the faith of that church.

It is possible, as suggested by the defendants, that what these paragraphs show is an intent to found a church which would be Greek Catholic only in faith and in form of worship but not in matters of jurisdiction. That, however, seems hardly probable. In the Greek Catholic church which these people had known in Podkarpatska Rus the Pope of Rome was recognized as the head not only in matters of faith and morals but also in matters of jurisdiction. In the Greek Catholic Church as it was in Podkarpatska Rus, these people knew that it was the Pope who appointed the bishops and that the bishops governed the local churches in their respective dioceses. There is no reason to believe therefore that the founders of the St. Elias Socity intended to make any ecclesiastical distinction between matters of faith and morals and forms of worship on the one side and matters of jurisdiction on the other. They wanted a church such as they and their fathers had had in the old country, a church in which the liturgy and other forms of worship were in the Old Slavonic language, whose forms and usages differed in many particulars from the Roman Catholic Church of the Latin Rite, but a church which acknowledged as its visible head, both in faith and jurisdiction, the Pope of Rome. Because the Greek Catholic Uniate Church was then not well organized in this country, in order to have the sort of a church they wanted, they had to provide for the governance of their local church, as a temporary expedient, in a way which in some particulars differed from the manner of the governance of Uniate churches in the old country. But, on the whole, the church paragraphs seem to reflect with reasonable clearness an intent on the part of the founders to establish a church which was to be Greek Catholic united with Rome.

That such was the intention of the founders of the church is, on the whole, confirmed by the evidence as to how they and their successors conducted the church after it was established. In order to understand the real purport of that conduct it must be viewed in the light of the history of the Greek Catholic Uniate Church, or as it is known here, The Roman Catholic Church, Greek Ruthenian Rite, as it developed in this country.

Although, as has already been pointed out, there had been an attempt by Rome in 1890 to place the Ruthenian churches in the United States under the control of the local Latin bishops by requiring that all priests coming to this country should be under those local bishops, by 1900 that attempt had

not been very successful. The part of the decree relating to celibacy of the clergy had not been enforced, and married priests continued to arrive. This, and other things continued the misunderstandings between the Ruthenian and the Latin clergy. The Latin clergy was not too anxious to adopt these people with different practices as fellow Catholics. The Ruthenian priests and people alike did not want to become latinized. As a consequence the Ruthenians were not closely associated with the Latin bishops and received very little attention from them.

In 1900 or 1901 the Pope sent Father Hodobay as Apostolic Visitator to this country to investigate the conditions of the Ruthenian churches. He remained here four years. He found that the Ruthenians wanted a bishop of their own rite in this country, and concluded that such a bishop was necessary to hold the churches in their union with Rome. As a matter of fact, he visited the people in Bridgeport, probably in 1903, and told them that very shortly they might expect that such a bishop would be sent. He made a report to Rome in June, 1905, urging that "the Greek Catholic Faithful may receive without delay a Bishop of their own Rite", and, probably as a result of that report, the Pope did send a bishop in the person of Stephen Soter Ortynski. He arrived in New York in October, 1907, and was there met by a congress of delegates from the Ruthenian churches.

At that congress Bishop Ortynski assured the people that he would protect them against latinization and do everything in his power to uphold the ancient rites and customs of the Greek Catholic Church. Upon the strength of that assurance the new bishop was for a time well received. Very soon, however, the bull ea semper issued by Rome in 1907 to define Bishop Ortynski's status became known to the Ruthenians. This provided that Ortynski was to be only a titular bishop, and in matters of jurisdiction he was to be substantially a vicar to the local Latin bishop. It also repeated the requirement of celibacy for the clergy, forbade the confirmation of children by the priests at baptism and made it easier for a person to transfer from the Greek Ruthenian Rite to the Latin Rite than vice versa.

Because of this bull, and also possibly because of Bishop Ortynski's personality and the feeling that he was not keeping his promise to oppose latinization, he was never a popular

bishop. In 1912 he was made a full bishop with all powers of an ordinary. Whatever good resulted from that, however, was counteracted by the promulgation of the *bull cum episcopo* in 1913. This bull announced Ortynski's appointment as a full bishop but renewed the regulations which had been contained in the *bull ea semper* (except that it made no mention of celibacy), so that the people felt that the effort to latinize them would continue. Agitation became rather violent. A congress of the churches met in Johnstown, Pa., in 1914 to protest, but conditions remained unchanged until Ortynski's death in 1916. Bishop Ortynski never had any firm control over the churches.

After his death Rome, upon the vote of the representatives of the churches, appointed two administrators, one Poniatishyn to be over the Galicians and Ukrainians and one Rev. Gabriel Martyak to be over those who had come from territory under the Hungarian crown. These latter, of course, included the Bridgeport church of St. John the Baptist.

Father Martyak's administration lasted until 1924. In that year Rome appointed Basil Takach as Greek Ruthenian Bishop of the United States, and, at the same time, the *bull cum episcopo* was renewed. Under Father Martyak the agitation had quieted down and things were quite harmonious. After the appointment of Takach and the republication of *cum episcopo*, however, the agitation revived and became bitter. In 1929 a bull known as *cum data* was published. Up to this time celibacy of the clergy had not been strictly enforced, at least so far as older priests were concerned, but in the *bull cum data* it was reaffirmed. The Greek Ruthenians considered this a matter of great importance, it being considered by them as an indication that Rome at last was going to make them just like the Latins. And so with the promulgation of *cum data* it appeared to many of them that matters were coming to a head. The Greek Catholic Union, an organization which had been formed of clergy and laity in the early 1890's, met in Binghampton, N.Y., in August, 1930, and prepared a protest to be sent to Rome. This protest, however, was headed off by Bishop Takach, and he started in to discipline some of the priests who had, as he believed, been prominent in the agitation. Among these priests was Father Chornock who was the priest in Bridgeport.

Most of the churches and clergy remained under Bishop

Takach's jurisdiction, but finally in July, 1933, about 36 churches, including the St. John the Baptist Church of Bridgeport, sent delegates to a congress and there adopted resolutions prepared by the Bridgeport church. These resolutions listed various "demands" and then provided that in the event that the Roman See did not meet these demands within 60 days then they would break relations with the Roman See. Rome did not meet the demands so these churches formed a diocese of their own. They elected Father Chornock first as administrator, then later as bishop, and petitioned the Patriarch of Constantinople to consecrate him as such. He was so consecrated in 1938.

Now, to revert to the conduct of The Greek Catholic Church Society of St. Elias the Prophet, the name of which was changed on May 8, 1904, to The Greek Catholic Church of St. John the Baptist, it is apparent that it did many things which, under the canon law governing the Roman Catholic Church of the Greek Ruthenian Rite, were irregular. In general, all through its history the church has managed its own business affairs by vote of the society. The society has been in control rather than the priest and the bishop. The first four priests who served the parish prior to the arrival of Bishop Ortynski, Fathers Jaskowics, Volkay, Dudinski and Gojdics, were engaged by vote of the society. Their salaries and stole fees, and the salaries and stole fees of the two subsequent priests, have always been fixed by vote of the society and not by the bishop. The cantors, trustees, treasurer, sexton and other church officers and employees have always been elected or hired and their compensation fixed by the church rather than by the priest.

The church has always required the payment of dues by its members, and from time to time has legislated to exclude members from the sacraments if they were delinquent in their dues. In addition it has required the payment of fixed amounts as so-called lot fees, at first of $12 to pay for the land on Arctic Street, and later of $35 to pay for the school property on Pembroke Street. The church has always elected a treasurer and, although it would appear that most of the time the priest has performed the duty of the treasurer in directing the disposal of funds, checks and withdrawal orders have been signed in accordance with various votes of the church by several additional officers. No expenditure exceeding $15, down to January, 1920, and $30 thereafter, has been permitted with-

out special vote of the society. Accordingly, nearly every-thing done by the church which required the expenditure of money was brought up, discussed and voted upon in meetings of the society. On at least one occasion, in 1908, it was voted that the priest should surrender the treasury, and in this the then priest acquiesced. This procedure is, of course, quite different from that contemplated by the canons of the Roman Catholic Church, under which the theory is that the local priest as agent of the bishop manages the fiscal affairs of the church.

In this connection, the defendants point to the fact that time after time amounts in excess of $500 have been expended by this society without the approval either of the Bishop of Hartford or the Greek Ruthenian bishop, which approval is required by the by-laws of a Roman Catholic corporation. This has no particular significance, however, as bearing on the intention of the society, because it appears that the society itself was not a Roman Catholic corporation, but was acting independently of the corporation known as The St. John Baptist Church. The society, in other words, was not bound by the by-law. Moreover, there is no probability that the members of the society knew of the existence of the by-law. The general canon law of the Roman Catholic Church pro-vides that no parish shall, without the approval of its bishop, make any expenditure in excess of such amount as shall be prescribed by that bishop. But it does not appear that the Greek Ruthenian bishop has ever fixed such a limit or if he had that the Bridgeport church knew about it.

The church purchased the land on Arctic Street and later in 1920 the land on Pembroke Street without the approval of any bishop, although as to the latter, Bishop Ortynski's approval may be inferred from the fact that he approved the $12,000 mortgage by which all but $4,550 of the purchase price was raised. It built the basement church in 1906 with-out the approval of any bishop except as that approval is im-plied from the act of the Bishop of Hartford in approving an $11,000 mortgage which provided most of the money for the structure. The verbal approval of the Bishop of Hart-ford, after correspondence with Bishop Ortynski, was obtained by Father Chornock for the building of the superstructure and the rectory in 1913, but no written approval was given in accordance with the technical requirements of the canons. In the same way there was no formal approval by Administra-

tor Martyak for the building of the school in 1924 and the purchase of an additional piece of land at that time, but the matter must have been discussed with him and his verbal approval obtained, because he consented to and approved in writing the mortgage of $90,000 placed on the property to raise the necessary funds.

In many other minor particulars the society acted inconsistently with church law. For instance, in May, 1910, the church voted that the priest Rev. Staurovsky should leave. He didn't leave then but later he acknowledged that he was "short in money" and soon after left of his own accord. The church then did the unusual thing of bringing suit against their former priest. That suit, however, was never pressed. On December 6, 1914, the church voted to leave the recovery of the money to the bishop "because it is his obligation to bring about order with his priests", and, to that extent at least, they recognized that they were a part of the Greek Ruthenian Rite. At odd times they also legislated, or attempted to, as to the conduct of worship. On one occasion, in the early years, they voted that the priest should not read the gospel in Hungarian, and on January 2, 1927, they voted that the pastor should have a sermon in English for the children. On another occasion they voted as to the tolling of the bells for the dead, and they planned the ceremonies for the blessing of the various buildings erected and the laying of the cornerstone of the church. On January 3, 1915, the church voted that the priest should cease to go to the Hungarian parish in the West End, but to accomplish that they voted to send a committee "to our Bishop that he should not allow our Father to go there", again recognizing that, in this matter at least, the Bishop had the final say. The society also chose names for the church and for the school, which ordinarily is the prerogative of the bishop.

This completes the list of the acts done by the St. Elias Society and the Church of St. John the Baptist which are uncanonical or irregular. In appraising the significance of them, as bearing on the question of what sort of a church these people intended to have, it must be borne in mind that when the church was organized and while the modes of procedure were being established, the Greek Ruthenian Rite of the Catholic Church as such was not yet functioning in this country. It was not until 1907 that a bishop for that rite

was sent here. The Ruthenians did not think of the Latin bishop as their bishop and they therefore considered themselves without a governing head. By force of necessity, therefore, they had to run their own affairs. If they were going to have a church at all they had to organize it themselves and manage it themselves. Accordingly, even though they recognized the fact that they were organizing and maintaining a Greek Catholic Church united with Rome, they were forced to do things in an uncanonical or irregular way. Indeed it is to be doubted that they knew very much about church law, and they had no bishop to see to it that canon law was complied with. By the time their bishop arrived their modes of procedure were firmly fixed and they naturally continued in the manner to which they had become accustomed. This was to be expected, particularly because their fear was that the bishop would try to latinize them, and because the bishop knew that they would resent anything which looked like a change toward latinization. Both the bishops and they were content to let matters run along as they had been so long as, in fundamentals, they remained Greek Catholics united with Rome and under the jurisdiction of the bishops sent by Rome. On the whole, therefore, the fact that the Church of St. John the Baptist in large measure continued to manage its own affairs and in many matters acted uncanonically does not have very much significance. It certainly cannot fairly be said to justify a conclusion that the intention was that it should be an independent autonomous church.

On the other hand, the acts of the church society reasonably well indicate that the founders and members intended it to be, and recognized that it was, a Greek Catholic Church united with Rome. Some such indications as the following:

The first and foremost is the vote that was taken at a meeting on February 28, 1904. At that meeting contributions were taken for the foundation of a Greek Catholic church and a committee was appointed to locate a site. Then item 4 of the minutes reads as follows: "4 It was discussed that in the event that we have a Church, shall we place it under a Bishop, and it was moved and seconded that we should have it under a Bishop, and this was carried by 106 votes, of whom 74 made their contributions and 32 of which signed their pledges for the Foundation of the Church. Three votes were opposed to this."

There may be some question as to what bishop this vote refers to. It certainly was not any bishop of the Eastern Orthodox Church, because, as pointed out earlier in this memorandum, these people were not of that church. They may have meant the Roman Catholic Bishop of Hartford, or more probably they meant the Uniate Bishop whom Father Hodobay had told them would be sent from Rome. In either case the vote indicates a clear intent that their church should be under the jurisdiction of a Roman Catholic bishop and that it should not be a lone independent church. So far as the records of the church disclose, this vote was never rescinded nor modified and it stands as an expression of the will of the church that it should be a part of the Greek Catholic Church united with Rome.

Another highly significant fact is that the priests of this parish have always been Uniate priests. Shortly after the organization of the St. Elias Society in the latter part of 1900 arrangements were made with Rev. Michael Jaskowics, who was then the priest at the Hungarian Greek Catholic Uniate Church on the West Side of Bridgeport, to come and say mass for and confess the Ruthenians on the East Side. This priest held faculties from the Uniate Bishop of Munkacs to the Greek Catholics in Bridgeport. He, with the consent of the Bishop of Hartford, agreed to serve the St. Elias Society and made arrangements to say mass for them in St. Michael's Roman Catholic Polish Church. Fr. Jaskowics left Bridge-port in April, 1901, and was succeeded in the Hungarian Church by Father Eugene Volkay. The arrangement made by the St. Elias Society with his predecessor was made with Fr. Volkay. Although there seems to be no record of facul-ties having been issued to him, he was later, in 1905, given faculties for New Britain by the Bishop of Hartford, and there can be no doubt but that he was a priest of the Greek Catholic Church united with Rome.

During Father Volkay's stay, which lasted until late 1903, the society hired a store on Pembroke Street and held services there. In the fore part of 1904 similar arrangements were made with Father Alexius Dudinski, who was also the priest at the Hungarian Church and was a Uniate priest. During his stay, which lasted only until November, 1904, the land on Arctic Street was purchased.

After Fr. Dudinsky left, the society decided to have a

priest of its own and engaged Father Elias Gojdics, who with-out question was a Uniate priest and was later very prominent in the hierarchy of the Greek Ruthenian Rite. Before he was settled in Bridgeport he made arrangements to conduct serv-ices for the society, which by then was known as The Greek Catholic Church of St. John the Baptist, in the basement of the St. John Nepomucene Slavonic Roman Catholic Church. That such arrangements could have been made indicates clearly that, at that time, the St. John the Baptist Church was com-monly regarded, at least, as affiliated with the Roman Catholic Church. It will be borne in mind that it was during Fr. Gojdic's administration that the basement church was built in 1906-7.

Parenthetically it might be pointed out that during the ad-ministration of Fr. Gojdics, at meetings held on January 28th and February 2, 1908, disputes arose between the priest and the people as to the control of church property. It appeared that the people did not then know how the title to the real estate stood but were satisfied to leave it as it was, and in particular recognized the fact that all church property was to be managed in accordance with the "statutes of the Latin Bishop."

None of the priests already mentioned had been definitely appointed to the church in question by any bishop, but it is apparent that they were serving there with the knowledge and acquiescence of the Bishop of Hartford.

Father Gojdics' successor, Rev. Paul Staurovsky, must have been definitely sent to the parish (in 1908) by Bishop Ortyn-ski, because there is no record in the minutes of the church relating to his being engaged by the church. There is no doubt but that he was a Greek Catholic priest united with Rome. He was succeeded by Rev. Orestes P. Chornock, who arrived in Bridgeport and took over the parish on March 25, 1911. Father Chornock was a Uniate priest and was ap-pointed to St. John the Baptist Church by Bishop Ortynski on March 11, 1911. The church meeting on March 26, 1911, accepted him and fixed his salary, but he clearly held his place by virtue of the appointment by the bishop. Father Chornock remained as priest of the parish until he was suspended from the pastorate by Bishop Takach in 1931, and indeed has been acting as pastor of the majority of the members of the church until the present time.

Another fact which tends to indicate what kind of a church the church in question is, is that from the very beginning down until after the school was built, at least, the masses said have been the liturgy of the Uniate Church. In this mass three prayers are offered for the Pope of Rome, speaking of him as "our most holy universal Bishop (naming him), Pope of Rome"; and one prayer is for "our God-loving Bishop", (naming him). After listening to these prayers the people must have recognized that the Greek Ruthenian bishop was their bishop and the Pope of Rome was their pope. Moreover, the antimensium which has been on the altar of the church from the beginning of its existence, without the presence of which no mass may be said, has been one consecrated by the Uniate bishop of Presov, and either given or sent to Fr. Gojdics. The metrical books show that from as early as 1905 it was the practice to procure from the Roman Catholic bishops whatever dispensations were necessary and that from time to time burials and baptisms were solemnized in the church by Roman Catholic priests of the Latin Rite.

Aside from the fact that the title to the real estate stood in the name of a Roman Catholic corporation, the members of the church knew that the mortgages thereon were approved respectively by Bishop Tierney, by Bishop Ortynski and by Administrator Martyak. A very significant vote was adopted at a meeting of the church on February 9, 1913. It was reported to the meeting that Bishop Nilan, then the Bishop of Hartford, did not want to sign the approval of the mortgage which was to be placed on the property to meet the cost of erecting the superstructure of the church and the rectory. This was probably because by that time Bishop Ortynski had been given full ordinary powers over the Greek Ruthenian Rite in this country. Accordingly it was voted "that a committee be selected from the congregation to go to the Bishop of Hartford to ask him in a nice way that he do that, and that he keep us beside him until such time as we shall have order here with our Bishop." That quite clearly indicates that at that time the members of the church recognized that they were a part of the Roman Catholic Church but they preferred to be under Bishop Nilan rather than Bishop Ortynski.

At the blessing of the cornerstone of the church on November 18, 1906, Roman Catholic priests were present. The ceremony of the dedication of the basement church on May

30, 1907, was conducted by a Roman Catholic monsignor from Hartford. The superstructure of the church was blessed in May, 1914, by Bishop Ortynski, and the school building was dedicated by Bishop Takach in September, 1925. All through the minutes relating to these ceremonies, and in other connections, Bishops Ortynski and Takach respectively are referred to as "our bishop." Incidentally, for the blessing of the bells of the church in 1914 Fr. Chornock procured the services of Fr. Misonay, a Roman Catholic priest of the Greek Ruthenian Rite from Yonkers.

Perhaps the clearest indication that the church in question recognized itself as being under bishops of the Roman Catholic Church is that it regularly paid cathedraticum. Cathedraticum is the assessment made on each local Catholic church to carry the expenses of the diocese. The payment of it is an acknowledgment that the local church is subject to the jurisdiction of the bishop and owes allegiance to him. St. John the Baptist Church has paid cathedraticum or something equivalent thereto for every year from 1905 to 1930 inclusive, except the years 1906, 1909 and 1910. The payment for 1905 was to the Diocese of Hartford. The payment for 1906 was remitted by Bishop Tierney. The payments for 1907 and 1908 were to the Bishop of Hartford. Bishop Tierney died October 5, 1908, and it was not until April 28, 1910, that Bishop Nilan, his successor, was consecrated. Cathedraticum is not payable when there is no bishop in the diocese, and that probably accounts for the lapse of payments in 1909 and 1910.

On August 27, 1911, Fr. Chornock, who had recently arrived in the parish, brought up in a church meeting the matter of resuming the payment of the "percentage." He reported that the Bishop of Hartford had told him that it should be paid "to our Bishop Ortynski." "And this was adopted Just as it was adopted on the 2nd day of February in the year 1908, that we should not pay, save give alms, to our Bishop up to the time when everything comes completely to order with our Bishop." The next vote with regard to cathedraticum came at a meeting on June 28, 1914. At that time Fr. Chornock stated that according to a new law cathedraticum should be $15 per month instead of $100 as it had been in the past, and it was voted "that the Cathedraticum for our Bishop remains as of old, that is, as we have been paying, one hundred dollars a year, until such time as he convokes a church congress, and if the parishioners of all the Churches

shall be appeased, we too must be appeased with this." No further votes on the subject are found until at the meeting of January 2, 1927. At that meeting "there was a discussion as to who permitted our Spiritual Father to give such a great cathedraticum, in the amount of $300. Thereupon, our Spiritual Father stated to the parishioners his right and it was accepted unanimously." On January 12, 1930, it was voted that if the protest sent to Homestead is not published "and if the two theologians are not ordained we shall cease to pay toward the Cathedraticum." This is the last vote taken concerning cathedraticum until the final break between the church and the diocese occurred.

During all the years, therefore, cathedraticum was paid, and the fact that it had been paid was reported at the time to the church meetings. It is true, as suggested by the defendants, that under church law cathedraticum must be paid by the local church and the local church has no right to legislate as to whether it is to be paid or not. However, in this case the votes on the subject are few and far between. The church never went so far as to refuse to pay it. It was actually paid and it is perfectly clear that the church recognized its obligation to pay. The church, in other words, realized and acknowledged that it was a part of the diocese and was subject to the jurisdiction of the bishops appointed by Rome.

It is also true that this church regularly paid Peter's Pence, contributed to the orphanage maintained by the diocese, contributed to an orphanage maintained by the Diocese of Presov, and from time to time made contributions to other Greek Ruthenian Rite churches in this State. These contributions were also regularly reported to church meetings, so that members of the parish knew that they were being made.

In 1915 the church society formed itself into a cemetery association, purchased land for the cemetery, and at a meeting of the church society itself on June 20, 1915 adopted by-laws for the cemetery, paragraph 7 of which reads as follows: "7 Said Cemetery is dedicated to the purpose of Christian burial only, and therefore no person's body may be buried therein unless the same be entitled to Christian burial according to the laws and regulations of the Greek and Roman Catholic Church, those who fall away from their religion or such *who do not recognize the Pope as the visible head of Christ's Church* shall have no right whatever to be interred in said

cemetery, even if the person had a lot in said Cemetery." (Italics added.)

People who did not recognize the Pope as the visible head of Christ's Church would not be apt to adopt a by-law which would preclude their being buried in their own cemetery. The fact that this group did adopt such a by-law is clear indication, therefore, that, at that time, they did consider themselves as members of the Roman Catholic Church.

The adoption in August, 1933, of the resolution already referred to and the events which led up to it are also of great significance. Because of the prominence of the Church of St. John the Baptist and of its pastor, Fr. Chornock, in the agitation of the Greek Ruthenian churches against Bishop Takach, which agitation had been fanned to a white heat by the *bull cum data* in 1929, the bishop, rather suddenly, in December, 1930, ordered Fr. Chornock to leave Bridgeport and go to Roebling, N.J. At a large mass meeting of the parish, held on January 4, 1931, it was voted as the sense of the meeting "that Father Chornock should remain with us for all time, until God calls him, and not a Bishop of this world." Nine hundred and sixty-five parishioners signed a protest against the removal and a committee of three was sent to the bishop to attempt to adjust the matter. This committee interviewed the bishop on February 3, 1931, without success. Fr. Chornock remained in Bridgeport and the bishop suspended him from his pastorate. Fr. Chornock appealed from this suspension, carrying his appeal finally to Rome, but the action of the bishop was confirmed. Later, negotiations were carried on between the Roman Catholic hierarchy and Fr. Chornock in an attempt to get the latter to recant and become reconciled to the Roman Catholic Church, but these were to no avail.

In the meantime the church society voted, on February 14, 1932, that John Popp and eight others be appointed as trustees to take the title to the church property, and Fr. Chornock, Michael Puskar and Andrew Sura, the then members of the Corporation, The St. John Baptist Church, other than the Bishop of Hartford and his vicar-general, were instructed to sign deeds of the property to those trustees. Those deeds were executed and delivered on February 7, 1932. Later, the corporation, The Russian Greek Catholic Church Of Saint John The Baptist of Bridgeport, Connecticut, Incorpor-

ated, was organized, and on May 3, 1933, John Popp, et al., as trustees, executed a deed of the property to that corporation.

Then in August, 1933, the church ratified the resolutions which had been prepared by members of the Bridgeport church and adopted by the Greek Catholic Union in July. In these resolutions it was laid down that "We stand firmly by the covenants of the Union of Uzerhod (Ungvar)." It was demanded (1) that celibacy and latinization be recalled, (2) that Bishop Takach and his cabinet be recalled, (3) that suspension and excommunication be lifted from all priests and laymen of the diocese, (4) that married seminarians be ordained, (5) that a bishop or administrator who is a citizen of the United States be elected, (6) that we have a representative in the Congregation of the Oriental Rite, (7) that our name be "Carpatho-Russian" instead of "Ruthenian", (8) that by-laws be made for the diocese, (9) that all church property be recorded in the name of the parish, and (10) that no parish shall pay any priest who opposes the rights and privileges of the Greek Catholic Church. It was then resolved: "In the event that the Roman See be not inclined to respect our rights, which were guaranteed to us by the Union of Ungvar in the year 1646, and does not take into consideration the demands of this Congress within 60 days, we, all the people, together with our Churches and the clergy, shall break relations with the Roman See for so long a time as our demands are not acknowledged, that is, we shall become independent from Rome."

Rome did not yield to these demands. The dissident churches, including the Bridgeport church, organized a diocese of their own and elected Fr. Chornock as administrator. On October 9, 1936, Fr. Chornock was excommunicated by Rome. In February, 1937, he was chosen bishop of the new diocese, and in September, 1938, he was consecrated as such bishop under the Patriarch of Constantinople.

The significance of the fact that the foregoing resolution was ratified by the Church of St. John the Baptist is clear. It can indicate only one thing, namely, that up to the time of its adoption the church was, and recognized itself to be, united with Rome. Otherwise, of course, there would have been no reason for, it to announce that it would "break relations with the Roman See", and "become independent from Rome." If the church had not been dependent upon Rome it could not very well "become" independent from it.

Without going further into details, the whole course of conduct of the St. Elias Society, later known as The Greek Catholic Church of St. John the Baptist, shows clearly that it was founded as a Greek Catholic Church united with Rome, and that it remained such during the whole course of its existence down to 1933. It was the intention of the members of that church that it should be what is known in this country as a Roman Catholic Church of the Greek Ruthenian Rite. From 1907 on, they had their disputes and quarrels with the Greek Ruthenian bishops, and that may have had some bearing on the fact that they did not conduct their affairs strictly in accordance with the canonical laws governing the diocese. But they always recognized that they were a part of the diocese and that they were under the jurisdiction of the Church of Rome and the Roman Catholic bishops.

That was the situation, in all events, at the time when the church acquired all of its real estate and turned the title thereto over to the Roman Catholic corporation known as The St. John Baptist Church. From that it follows that that corporation must hold the title for the uses and purposes of the Roman Catholic Church of the Greek Ruthenian Rite. Rev. Daniel P. Maczkov is the duly accredited representative of that church in Bridgeport, and possession of the premises should be turned over to him.

One other matter remains to be considered. Each side in this litigation has claimed that whatever rights the other side may have had have been lost by waiver, laches or adverse possession.

So far as any rights of the church society is concerned, or of those members of it who have broken from their allegiance to Rome, those would not have been lost in any of those ways. The title of the property has been held in trust, either express or resulting. If the trust had been found to have been for uses and purposes different from what the trustee The St. John Baptist Church corporation now recognizes, those uses and purposes could not have been changed by mere lapse of time unless the trustee had openly and notoriously diverted the property from those uses. *Restatement, Trusts,* §409. There was never any such diversion, but, if there had been, it certainly did not occur until the split came in 1933, and there certainly has been no waiver nor laches on the part of the dissident members of the church since then.

In the same way, on the other hand, there has been no waiver nor laches on the part of The St. John Baptist Church, nor has adverse possession run against it. Down to 1933 the property was used for the purposes of a Roman Catholic Church of the Greek Ruthenian Rite. At least, down to that time, there was no clear assertion on the part of the church society that it was using the property for some other purposes. Under such circumstances an unincorporated society is not holding adversely to its trustee so as to gain any rights by adverse possession or by reason of laches. *Burrows vs. Holt,* 20 Conn. 459. Indeed, it is doubtful that a charitable or religious use can be exterminated or changed by reason of any waiver or laches on the part of a trustee for that use. Since 1933 there clearly have been no acts nor lack of action on the part of The St. John Baptist Church which under all of the circumstances would constitute laches or could be construed as a waiver.

For the foregoing reasons judgment may enter declaring that The St. John Baptist Church holds the title to the property described in the complaint for the use and purposes of a Roman Catholic Church of the Greek Ruthenian Rite, and that the purported conveyance to John Popp, et al., trustees, and from them to The Russian Greek Catholic Church Of St. John The Baptist, Incorporated, and the mortgage to The Saint Basil Society are void. Said judgment shall enjoin the defendant, The Saint Basil Society Of St. John The Baptist Greek Catholic Church, Incorporated, to release said mortgage and the defendant, The Russian Greek Catholic Church Of Saint John The Baptist Of Bridgeport, Connecticut, Incorporated, to reconvey the title to the property to The St. John Baptist Church. The judgment shall further declare that Rev. Daniel Maczkov is entitled to possession of the property, and enjoin The Russian Greek Catholic Church Of Saint John The Baptist Of Bridgeport, Connecticut, Incorporated, to turn that possession over to him. No costs shall be taxed in favor of any party.